Laura Marquez-Garrett, SBN 221542
laura@socialmediavictims.org
SOCIAL MEDIA VICTIMS LAW CENTER
1390 Market St, Suite 200
San Francisco, CA 94102
Ph: 206-294-1348

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

|  |  |
|---|---|
| T.R., individually and as next friend to minor child E.R., <br><br> Plaintiff(s), <br><br> v. <br><br> META PLATFORMS, INC., formerly known as FACEBOOK, INC.; SNAP, INC.; TIKTOK INC; and BYTEDANCE INC. <br><br> Defendants. | Case No. _____ <br><br> COMPLAINT FOR PERSONAL INJURIES <br><br> JURY DEMAND |

"In these digital public spaces, which are privately owned and tend to be run for profit, there can be tension between what's best for the technology company and what's best for the individual user or for society. Business models are often built around maximizing user engagement as opposed to safeguarding users' health and ensuring that users engage with one another in safe and healthy ways. . . . Technology companies must step up and take responsibility for creating a safe digital environment for children and youth. Today, most companies are not transparent about the impact of their products, which prevents parents and young people from making informed decisions and researchers from identifying problems and solutions."

*Protecting Youth Mental Health,* The U.S. Surgeon General's Advisory (December 7, 2021)

Plaintiff T.R. individually and as next friend to minor child E.R. bring this action for personal injury and loss of consortium against Meta Platforms, Inc., formerly known as Facebook, Inc., doing business as Instagram ("Instagram") and Facebook ("Facebook") (collectively, "Meta"), Snap, Inc. and TikTok Inc. and ByteDance Inc. (collectively, "TikTok") and allege as follows:

## I.   INTRODUCTION

1.     This product liability action seeks to hold Defendants' Instagram, Facebook, Snapchat, and TikTok products responsible for causing and contributing to the burgeoning mental health crisis perpetrated upon the children and teenagers of the United States and, specifically for the injuries they caused E.R. beginning in or around 2017, when she was only twelve years old. Those injuries, proximately caused by Defendants' unreasonably dangerous social media products–Facebook, Instagram, Snapchat, and TikTok–include but are not limited to addiction, anxiety, depression, eating disorders, and, ultimately, suicide attempts.

2.     On December 7, 2021, the United States Surgeon General issued an advisory cataloging a dramatic increase in teen mental health crises including suicides, attempted suicides, eating disorders, anxiety, depression, self-harm, and inpatient admissions. While the most significant and far-reaching change to the lives of young people during this period was the launch and light speed growth of certain social media platforms, most prominently for purposes of this litigation lawsuit,

a.  The Facebook and Instagram products, designed and distributed by Meta,

b.  The Snapchat product, launched in 2011 by Snap, Inc., and

c.  The TikTok product, launched in 2016 and designed and distributed by TikTok.

3.     Plaintiffs' harms are a symptom of this current mental health crisis among American youth caused by these Defendants – which comes as no surprise to Defendants. From the beginning, Defendants have exploited vulnerabilities in human psychology to addict users and maximize user time and engagement. Meta's first President, Sean Parker, summed up the devastating impact of these social media designs in a 2017 interview:

> God only knows what it's doing to our children's brains. The thought process that went into building these applications, Facebook being the first of them, .. was all about: "How do we consume as much of your time and conscious attention as possible?" And that means that we need to sort of give you a little dopamine hit every once in a while, because someone liked or commented on a photo or a post or whatever. And that's going to get you to contribute more content, and that's going to get you .. more likes and comments. It's a social-validation feedback loop .. exactly the kind of thing that a hacker like myself would come up with, because you're exploiting a vulnerability in human psychology. The inventors, creators — it's me, it's Mark [Zuckerberg], it's Kevin Systrom on Instagram, it's

all of these people — understood this consciously. And we did it anyway.[1]

4.      For years, Defendants have operated under the fiction that they are untouchable and have operated with the goal of exercising control over the entirety of America's youth – which allegation is proven by Defendants' own records and testimony of former employees. Meta's founder, Chairman, CEO, and controlling stockholder, Mark Zuckerberg, for many years ended company meetings with the exhortation "Domination!"[2] This is the mentality under which these Defendants operate and, until now, they came shockingly close to reaching that objective.

5.      By 2014, 80 percent of high school students said that they used a social media platform daily, and 24 percent reported being online "almost constantly." Millions of U.S. children and teenagers check their social media accounts hundreds, if not thousands, of times every day, and spend hours on social media to the point of extreme exhaustion and sleep deprivation. Millions of teenagers also want to quit using social media but feel as though they cannot. These children and teens are so locked-in to Defendants' products that they harm themselves and/or put themselves in harms' way when their parents attempt to limit or remove access to Defendants' products. Defendants are aware of these harms, and their pervasiveness, and are counting on their designed addictions and exploitation of children and teens to keep them in their positions of unchecked growth and power.

6.      Peer reviewed studies and the available medical science have identified social media use as a cause of major mental health injuries among youth. Large observational studies and experimental results point to such use as the cause of sleep deprivation, anxiety, depression, anger, eating disorders, suicidal ideation, and suicide and self-harm. More to the point, Defendants' own internal studies and/or observations have concluded the same.

---

[1] Mike Allen, *Sean Parker unloads on Facebook: "God only knows what it's doing to our children's brains"*, Axios (November 9, 2017), https://www.axios.com/2017/12/15/sean-parker-unloads-on-facebook-god-only-knows-what-its-doing-to-our-childrens-brains-1513306792.

[2] Evan Osnos, *Can Mark Zuckerberg Fix Facebook Before It Breaks Democracy?*, THE NEW YORKER (Sept. 10, 2018); *see also, e.g.*, See, e.g., Kate Losse, *THE BOY KINGS: A JOURNEY INTO THE HEART OF THE SOCIAL NETWORK* (2012); Renee M. Jones, *The Unicorn Governance Trap*, 166 U. PA. L. REV.  ONLINE  165, 186-87  (2017), http://www.pennlawreview.com/online/166-U-Pa-L-Rev-Online-165.pdf.; Cecilia Kang and Sheera Frenkel, AN UGLY TRUTH: INSIDE FACEBOOK'S BATTLE FOR DOMINATION (2021); Henry Blodget, *Mark Zuckerberg on Innovation*, BUSINESS INSIDER (Oct. 1, 2009) (quoting Zuckerberg: "Move fast and break things. Unless you are breaking stuff, you are not moving fast enough.").

7.     Defendants have invested billions of dollars to design and develop their products to encourage, enable, and push content to children and teenagers that Defendants know to be problematic and highly detrimental to their minor users' mental health.

8.     Each of Defendants' products contains unique product features which are intended to and do encourage addiction, and unlawful content and use of said products, to the detriment of their minor users.

9.     Defendants target and market their products to children and teens, design their platforms around sunk cost and network effect principles – which designs are not known to ordinary and reasonable consumers – for the express purpose of locking in minor users so that they continue to use Defendants' products, no matter the cost to those same minor users' health and well-being. In fact, Defendants know the cost to those minor users which is why most (if not all) of Defendants' principals and designers severely restrict and/or prohibit the use of these products by their own children. Plaintiffs can think of no other industry where product manufacturers have gotten away with marketing and distributing to kids, while being too afraid of the product they are making to let their own kids use it; much less while repeatedly representing to the public and even to Congress in sworn testimony that their products are not addictive, and that they utilize all available technologies to keep kids safe.

10.     Defendants have perpetrated a terrible fraud and cover up upon the American public, and the world, and have gotten away with it for far too long.

11.     Plaintiffs bring claims of strict liability based upon Defendants' defective design of their social media products that renders such products not reasonably safe for ordinary consumers or minor users. It is technologically feasible to design social media products that substantially decrease both the incidence and magnitude of harm to minors arising from their foreseeable use of Defendants' products with a negligible increase in production cost.

12.     Plaintiffs also brings claims for strict liability based on Defendants' failure to provide adequate warnings to minor users and their parents of the danger of mental, physical, and emotional harms and sexual abuse arising from foreseeable use of their social media products. The addictive quality of Defendants' products and the impacts of their harmful algorithms are unknown

to minor users and their parents.

13.     Plaintiffs also brings claims for common law negligence arising from Defendants' unreasonably dangerous social media products and their failure to warn of such dangers. Defendants knew, or in the exercise of ordinary care should have known, that their social media products were harmful to a significant percentage of their minor users and failed to redesign their products to ameliorate these harms or warn minor users and their parents of dangers arising out of the foreseeable use of their products.

14.     Plaintiffs bring claims under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code, §§17200, *et seq*. The conduct and omissions alleged herein constitute unlawful, unfair, and/or fraudulent business practices prohibited by the UCL.

15.     Plaintiffs also bring a claim for unjust enrichment. Defendants received a direct benefit from problematic and harmful use of their product. Under the circumstances stated herein, it would be unjust and inequitable for them to retain those ill-gotten benefits.

16.     Plaintiffs bring claims for invasion of privacy. Defendants' conduct detailed herein frustrated and intruded upon Plaintiff T.R.'s fundamental rights to protect her child and to monitor and control her use of social media, and this intrusion occurred in a manner that was highly offensive to a reasonable person.

17.     Finally, Plaintiff T.R. brings claims for sex discrimination pursuant to California's Unruh Civil Rights Act. Defendants are engaged in discriminatory practices, including but not limited to the direction of harmful disordered eating content to female users in exponentially greater amounts and based at least in part on the fact that they are female. Defendants know that they are discriminating and continue to do so despite the very real harm these deliberate, discriminatory practices are causing to their female users. California law prohibits such reprehensible conduct, including for online business establishments like Meta, Snap and TikTok.

## II.     PARTIES

18.     Plaintiffs T.R., and her minor child E.R. reside in Texas. T.R. has not entered into a User Agreement or other contractual relationship with any of the Defendants herein in connection with E.R.'s use of their social media products, and further disaffirm all "agreements" that her child

E.R. may have entered with Defendants. T.R. also disaffirms all "agreements" she may have entered with Defendants. As such, Plaintiffs are not bound by any arbitration, forum selection, choice of law, or class action waiver set forth in any such "agreements."

19.     Defendant Meta Platforms, Inc., formerly known as Facebook, Inc., is a Delaware corporation with its principal place of business in Menlo Park, CA. Defendant Meta Platforms owns and operates the Facebook and Instagram social media platforms, applications that is widely available to users throughout the United States.

20.     Defendant Snap, Inc. is a Delaware corporation with its principal place of business in Santa Monica, CA. Defendant Snap owns and operates the Snapchat social media platform, an application that is widely marketed by Snap and available to users throughout the United States.

21.     Defendant TikTok Inc. is a California corporation with its principal place of business in Culver City, CA. Defendant TikTok owns and operates the TikTok social media platform, an application that is widely marketed by TikTok and available to users throughout the United States.

22.     Defendant ByteDance Inc. is a Delaware corporation with its principal place of business in Mountain View, CA. Defendant ByteDance owns TikTok Inc. and owns/operates the TikTok social media platform.

### III.     JURISDICTION AND VENUE

23.     This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, and Plaintiffs and Meta are residents of different states. Venue is proper in this District under 28 U.S.C. § 1391(b)(2).

24.     This Court has personal jurisdiction over Defendants because their principal place of business is California and Defendants are "at home" in this State, in addition to which, Plaintiffs' claims set forth herein arise out of and relate to Defendants' activities in the State of California.

25.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendants Meta and ByteDance Inc.'s principal places of business are in the Northern District of California and Defendants Snap, Inc. and TikTok Inc. are residents of the State of California.

#### IV.     DIVISIONAL ASSIGNMENT

26.     The case is properly assigned to the San Francisco Division pursuant to Civ. L. R. 3-2(c)–(d) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in San Mateo County, where Defendant Meta maintains its primary place of business, and Santa Clara County, where Defendant ByteDance Inc. maintains its primary place of business.

#### V.     FACTUAL ALLEGATIONS

27.     In late 2021, a Facebook whistleblower disclosed thousands of internal Meta documents to the United States Securities Exchange Commission (the "SEC") and Congress. The Facebook Papers prove known dangerous designs and design defects as well as operational decisions and calculations, and a causal relationship between use of Defendants' various social media products in their current form and resulting addiction, anxiety, depression, eating disorders, exploitation and grooming, and what Meta internally refers to as "SSI" (Suicide and Self Injury). While the Facebook Papers originate from Meta, they prove known dangerous designs and design defects as well as other dangers caused by the social media products of both Defendants.[3]

28.     Defendants have knowledge about the harms their products cause users, particularly teen, child, and other vulnerable user populations, and all Defendants continue to operate those products in a harmful and dangerous manner anyway and in the interest of competing with one another and increasing already astronomical profits. Meta is simply the only one whose documents have been disclosed; even then, Plaintiffs anticipate literal truckloads of additional evidence that will support these claims and show precisely what these social media designers and distributors have done in the name of corporate greed.

29.     These Defendants are making calculated cost-benefit business decisions and are consistently prioritizing their already astronomical profits over human life.

---

[3] Examples of the Facebook papers have been published by the Wall Street Journal (https://digitalwellbeing.org/the-facebook-files-on-instagram-harms-all-leaked-slides-on-a-single-page/), Gizmodo (https://gizmodo.com/facebook-papers-how-to-read-1848702919), and other publishers, and have been disclosed to the SEC, Congress, and others on a global scale. Plaintiffs expressly incorporate all such documents into this Complaint by reference, which are central and material to certain of Plaintiffs' claims.

**A.      Meta and its Facebook and Instagram Products**

30.      Meta, founded in 2004, is the world's largest social media company, and its motto until recently was "Move Fast and Break Things," while Instagram began as a simple photo-sharing application, which Meta purchased in 2012.

31.      When Meta began, access to its products were limited to college students, with email and/or domain verification to confirm the same.

32.      In September 2006, Meta opened Facebook up to everyone. It claimed that it provided access only to persons 13 and older, and that users under 18 should obtain parental consent. But it also stopped verifying age or identity, to the point where Meta does not even verify existence of a valid email address – meaning that underage users enter nonsense email addresses and Meta provides access to limitless Facebook and Instagram accounts. These product changes were good for Meta's bottom line but resulted in the complete absence of reasonable safety features for children and teens as ensured unfettered access for them to Meta's social media products irrespective of age and/or parental consent. Meta's popularity and profits skyrocketed as a result.

33.      In 2009, Meta launched the "like" button product and, in 2011, it launched Facebook Messenger. By 2012, when Meta acquired the Instagram social media product, it was making rapid and significant changes to all its social media products – including Facebook and Instagram – which changes focused on increasing engagement at any cost. This included product changes, as well as changes in data collection and advertising policies and procedures; essentially any change Meta could think up that might bolster engagement and revenue, particularly among children and teens, and create greater addiction and network effects features to ensure that those users would be locked-in to its social media products for years to come. Unfortunately for the world, Meta made these changes at the direct expense of user safety and autonomy.

34.      To name only one example, in 2014, Meta applied for just one of its many patents for new processes and systems Meta was developing in connection with its recommendation technologies. Patent No. 9798382, Systems and methods of data and eye tracking analysis, relates specifically to the eye tracking processes Meta uses in its content recommendation systems (a/k/a algorithms). This patented technology would enable Meta to utilize the eye movements, pauses,

etc. of its users to determine what content Meta wants to identify and push to users in its effort to increase engagement. This means, for example, that if someone paused on offensive content because it is *offensive* but has no desire to view or otherwise engage with the content, as evidenced by the fact that they do not like, react to, or share the offensive content, Meta could use the fact of the pause to identify and push similar content to them anyway.

35. In 2015 and 2016, Meta made other changes to its Facebook and Instagram content recommendation technologies, including programming its products for engagement rather than user interest or safety; and implementing a multitude of other technologies meant to help Meta determine what might catch each user's attention, irrespective of what the user requested or wanted to see. This included Meta's decision to collect, utilize, and/or sell user data in connection with activities taken *off* its Facebook and Instagram social media products. Essentially, most internet and/or device related activities were now subject to Meta's collection and control, with no transparency as to what Meta was doing with this extensive collection of user data.

36. Nor did Meta leadership use this new-found control in ethical or honest ways. Instead, it knowingly addicted its users and lied to governmental and investigative authorities and to the American public, in the interest of its own profits and growth. To name only some examples,

   a. <u>Cambridge Analytica</u>. Since at least 2015, Meta and its leadership "knew that the private information of millions of Facebook users had been used for nefarious purposes since at least 2015, but failed to cause Facebook to acknowledge or disclose this information." Instead, they "caused Facebook to actively obfuscate the extent of its information privacy and compliance failures. [Their] dishonesty knew few limits, as [Mark] Zuckerberg mislead United States Congress in hearing conducted in the wake of Cambridge Analytica, and UK authorities found that Facebook's responses to its inquiries had been conducted in '**bad faith**.'"[4]

   b. On June 8, 2018, Facebook submitted certain written *Responses to Additional Questions from the Senate Commerce Committee*, which responses "further built

---

[4] Second Amended Verified Stockholder Derivative Complaint, filed in the Court of Chancery of the State of Delaware, C.A. No. 2018-0307-JRS, ¶ 13; *see also id*. at ¶¶ 176, 229.

on [Mark] Zuckerberg's false and misleading statements in his live testimony." *Id.* at ¶¶ 202-203; *see id.* at ¶¶ 203-216 (providing multiple examples taken from testimony and documentary evidence).

c. On February 18, 2019, the UK Committee Chair Damian Collins, made the following public statements,

> We believe that in its evidence to the Committee Facebook has often deliberately sought to frustrate our work, by giving incomplete, disingenuous and at times misleading answers to our questions.

> Even if Mark Zuckerberg doesn't believe he is accountable to the UK Parliament, he is to the billions of Facebook users across the world.

> Evidence uncovered by my Committee shows he still has questions to answer yet he's continued to duck them, refusing to respond to our invitations directly or sending representatives who don't have the right information. Mark Zuckerberg continually fails to show the levels of leadership and personal responsibility that should be expected from someone who sits at the top of one of the world's biggest companies.

d. In litigation pending before the International Court of Justice stemming from the Rohingya genocide, Facebook took "aggressive measures to conceal evidence of its involvement."[5]

e. In testimony before Congress in September 2020, Tim Kendall, Facebook's first Director of Monetization likened Facebook's business model to that of Big Tobacco,

> At Facebook, I believe we sought to mine as much human attention as possible and turn it into historically unprecedented profits. To do this, we didn't simply create something useful and fun; we took a page from Big Tobacco's playbook, working to make our offering addictive at the outset….

---

[5] Class Action Complaint filed on December 6, 2021, in *Doe v. Meta Platforms, Inc.*, Superior Court of the State of California for the County of San Mateo, ¶ 27; *citing* Robert Burnson, *Facebook's Stance on Myanmar Genocide Records Assailed by Gambia*, BLOOMBERG (Oct. 28. 2021), https://www.bloomberg.com/news/articles/2021-10-28/facebook-sstance-on-myanmar-genocide-records-assailed-by-gambia.

The next page in Big Tobacco's playbook was to add bronchodilators to cigarettes. This allowed the smoke to get in contact with more surface area of the lungs. Allowing for misinformation, conspiracy theories, and fake news to flourish were Facebook's bronchodilators.

But that incendiary content wasn't enough. Tobacco companies then added ammonia to cigarettes to increase the speed with which nicotine traveled to the brain. Facebook's ability to deliver this incendiary content to the right person, at the right time, in the exact right way—through their algorithms—that is their ammonia. And we now know it fosters tribalism and division.

Social media preys on the most primal parts of your brain; it provokes, it shocks, and it enrages….

Facebook and their cohorts worship at the altar of engagement and cast other concerns aside, raising the voices of division, anger, hate, and misinformation to drown out the voices of truth, justice, morality, and peace.[6]

f.  Statements by Mr. Chairman Blumenthal at the October 5, 2021 Senate Hearing, based on Meta's own documents, which were provided to Senator Blumethal by the Facebook whistleblower:

Among other revelations, the information that you have provided to Congress is powerful proof that Facebook knew its products were harming teenagers. Facebook exploited teens using powerful algorithms that amplified their insecurities and abuses through what it found was an addict's narrative. There is a question, which I hope you will discuss, as to whether there is such a thing as a safe algorithm. Facebook saw teens creating secret accounts that are often hidden from their parents as unique value proposition. In their words, a unique value proposition. A way to drive out numbers for advertisers and shareholders at the expense of safety, and it doubled down on targeting children pushing products on pre-teens not just teens, but pre-teens that it knows are harmful to our kids' mental health and wellbeing.

Instead of telling parents, Facebook concealed the facts, it sought to stonewall and block this information from becoming public, including to this committee when Senator

---

[6] *Mainstreaming Extremism: Social Media's Role in Radicalizing America: Hearing Before the House Subcommittee on Consumer Protection and Commerce,* 116th Congress (Sept. 24, 2020) (statement of Timothy Kendall).

Blackburn and I specifically asked the company. And still, even now, as of just last Thursday, when a Facebook witness came before this committee, it has refused this disclosure or even to tell us when it might decide whether to disclose additional documents. And they've continued their tactics, even after they knew the disruption it caused it. Isn't just that they made money from these practices, but they continued to profit from them. Their profit was more important than the pain that they caused.

Last Thursday, the message from Ms. Antigone Davis, Facebook's Global Head of Safety was simple, "This research is not a bombshell." and she repeated the line, not a bombshell. Well, this research is the very definition of a bombshell. Facebook and big tech are facing a big tobacco moment, a moment of reckoning, the parallel is striking. I sued big tobacco as Connecticut's attorney general, I helped to lead the states in that legal action and I remember very, very well, the moment in the course of our litigation when we learned of those files that showed not only that big tobacco knew that its product caused cancer but that they had done the research, they concealed the files, and now we knew and the world knew. And big tech now faces that big tobacco jaw dropping moment of truth. It is documented proof that Facebook knows its products can be addictive and toxic to children. And it's not just that they made money, again, it's that they valued their profit more than the pain that they caused to children and their families.[7]

37.     With the knowledge that young users – children – were Meta's only opportunity for continued growth and market dominance in the United States, Meta ramped up its product development efforts and its marketing to children and teens – including and specifically to children under the age of 13. Meta designed several new products and re-designed several old ones on its Facebook and Instagram platforms, launched and marketed games and emojis, and became significantly more involved with content creation. It also made it easier for kids to hide accounts and switch between accounts on a single device and, at one point, launched a campaign to ensure that all teens knew of their ability to open multiple accounts.

38.     Meta also continued finding new ways to monetize user content and the users

---

[7] https://www.rev.com/blog/transcripts/facebook-whistleblower-frances-haugen-testifies-on-children-social-media-use-full-senate-hearing-transcript ("October 5, 2021, Senate Hearing Transcript"), Chairman Blumenthal at 00:04:09, 00:05:21, 00:06:14.

themselves, including development of incredibly complex and invasive advertising products, tools, and technologies – which have made Meta billions in revenue on an annual basis, at the expense of Meta's users, including T.R.

39.     Meta designs and operates its product in a manner that promotes harmful and/or unhealthy content. Meta is aware of these inherently dangerous product features and has repeatedly decided against changing them and/or implementing readily available and relatively inexpensive safety measures, for the stated purpose of ensuring continued growth, engagement, and revenue increase. The following are just a fraction of the disclosed Meta documents – Meta's own documents – proving Meta's knowledge of the harms its products are causing to young users,



"Teen Mental Health Deep Dive," Mental Health Findings: Deep dive into the reach, intensity, Instagram impact, self-reported usage and support of mental health issues [2019 internal document reporting findings from a 6-country user survey (n=22,410) across Brazil, India, Indonesia, Japan, Turkey, USA], published by the Wall Street Journal, p. 28.[8]

---

[8] https://digitalwellbeing.org/the-facebook-files-on-instagram-harms-all-leaked-slides-on-a-single-page/

*Id.* at p. 30.

*Id.* at p. 54.



"Teen Girls Body Image and Social Comparison on Instagram – An Exploratory Study in the US," p. 29.[9]

*Id*. at p. 30.

---

[9] https://digitalwellbeing.org/wp-content/uploads/2021/10/Facebook-Files-Teen-Girls-Body-Image-and-Social-Comparison-on-Instagram.pdf





*Id.* at p. 33 and 34.



*Id*. at p. 9. Meta documents also report that 13.5% of teen girls on Instagram say that the platform makes thoughts of Suicide and Self Injury (SSI) worse; while 17% of teen girls on Instagram say that the platform makes "Eating Issues" (*e.g.* anorexia and bulimia) worse,



*See*, https://digitalwellbeing.org/the-facebook-files-on-instagram-harms-all-leaked-slides-on-a-single-page/, Slide 14 of "Hard life moment – mental health deep dive." According to an article published by the Wall Street Journal,[10]

> For the past three years, Facebook has been conducting studies into how its photo-sharing app affects its millions of young users. Repeatedly, the company's researchers found that Instagram is harmful for a sizable percentage of them, most notably teenage girls.
>
> "We make body image issues worse for one in three teen girls," said one slide from 2019, summarizing research about teen girls who experience the issues.
>
> "Teens blame Instagram for increases in the rate of anxiety and depression," said another slide. "This reaction was unprompted and consistent across all groups."
>
> Among teens who reported suicidal thoughts, 13% of British users and 6% of American users traced the desire to kill themselves to Instagram, one presentation showed.

Meta documents also discuss the fact that "Constant comparison on Instagram is 'the reason' why there are higher levels of anxiety and depression in young people."

*See, supra,* "Teen Mental Health Deep Dive," p. 27. What the Facebook Papers establish is that the devastating social comparison harms teens are suffering in staggering rates are not the result

---

[10] https://www.wsj.com/articles/facebook-knows-instagram-is-toxic-for-teen-girls-company-documents-show-11631620739

of any one piece of content or interaction on Defendants' social media products, but rather, the result of these defendants deliberate and addictive designs and the sheer volume at which Defendants' products identify and push certain, unrequested content to young users – all for the benefit of Defendants' bottom line. Defendants have made a deliberate decision to value profits over human life, and children and teens are paying the price for that.

40.     Despite Meta's many harmful product changes, re-designs, and launches, Facebook founder and CEO, Mark Zuckerberg, made public statements assuring the world that safety was Meta's top priority. For example, in February 2017, he posted on his personal Facebook "Building Global Community," in which he talked at length about how Meta is focused on safety, how it intends to use its AI to the fullest to keep users safe, and how amazing Meta is for bringing communities together, promoting critically important social groups, and other statements that we now know to be untrue, and profoundly dangerous, given what was actually happening at Meta and what Mr. Zuckerberg knew about the harms his products were causing American youth.

41.     By 2017, however, Meta employees were already reporting to management that Facebook was causing harmful dependencies. Meta was studying and purposefully designing its products in a manner that required sunk cost and system effects that would ensure its ability to lock-in its young users – that is, to make sure that they would never leave. Meta was marketing to children under 18, as well as children under 13 despite clear legal mandates that it could not knowingly allow children under 13 on its social media products. And Meta leadership, Mark Zuckerberg himself, was actively rejecting proposed re-designs and fixes that would have minimized the harms Meta's products were actively causing to children and teen users, users like T.R. Meta failed to act because engagement was its first priority and teens and children its primary target for acquisition – Meta had long since identified teens as its key to success, including because teen users could influence and encourage their younger brothers and sisters to use Meta's products.

42.     Meta also creates images and GIFs for users to post on their videos and pictures in connection with its Facebook and Instagram products. Meta has also acquired publishing rights to thousands of hours of music, which it provides to its users to attach to the videos and pictures that they post on Facebook and/or Instagram. The GIFs, images, and music are integral to the user's

post and are, in fact, designed to encourage posting. Indeed, in many cases, the only content in a user's post is the image, GIF or music supplied by Meta. When users incorporate images, GIFs, and music supplied by Meta into their postings, Meta is functioning as a co-publisher of such content. A Facebook and/or Instagram user who incorporates images, GIFs or music supplied by Meta into their post is functionally equivalent to a novelist who incorporates illustrations into their story. Instagram can no longer characterize the images, GIFs, and music it supplies to its users as third-party content, just as the novelist cannot disclaim responsibility for illustrations contained in their book. Meta has made the deliberate decision to collaborate with its users in this regard and, as evidenced by Meta's internal documents, Meta's decision is motivated by the fact that such collaboration results in increased engagement, advertising revenue, and other profits for Meta itself.

43.     Meta also has ownership and/or licensing, and other legal, rights in all third-party content, such that it is not "third-party content" at all. To name only one example, in 2012, Meta revised its Instagram Terms of Service to the following,[11]

> To help us deliver interesting paid or sponsored content or promotions, you agree that a business or other entity may pay us to display your username, likeness, photos (along with any associated metadata), and/or actions you take, in connection with paid or sponsored content or promotions, without any compensation to you.

44.     Its current terms (effective January 4, 2022) are different, but still grant Meta the right to use all third-party content at Meta's sole and unilateral discretion and in connection with all its social media products.

45.     Meta directly profits from the videos and pictures its users create in collaboration with Meta, as described above.

46.     Meta knows that it is harming teens yet, when faced with recommendations that would reduce such harms, Meta's leadership consistently opted for prioritization of profit over the health and well-being of its teen users.

47.     Meta knows that underage users are on its platform and has deliberately designed

---

[11] https://www.theverge.com/2012/12/18/3780158/instagrams-new-terms-of-service-what-they-really-mean

its product in a manner intended to evade parental authority and consent, including but not limited to Meta's failure to verify age and identity, provision of multiple accounts, marketing aimed at informing minors that they can open multiple accounts, failure to provide a point of contact for parents to notify Meta of lack of consent, marketing aimed at children and that encourages children to use Meta's social media product without consent, and multiple other features and conduct by Meta aimed at ensuring young users have a means to access Meta's social media products no matter the circumstances.

48. The Facebook and Instagram products are used by many millions of children every day, children who have become addicted to these Meta products because of its design and product features, children like E.R., to the point where parents cannot remove all access to these products without self-harm, suicide, and other foreseeable consequences of serious addiction, and where such cessation of use would require professional intervention.

**B.    TikTok and its TikTok Product**

49. TikTok is known as a video-sharing app, where users can create, share, and view short video clips, and is highly integrated with its Chinese parent, ByteDance.

50. Known in China as Doujin, TikTok hosts a variety of short-form user videos, from genres like pranks, stunts, tricks, jokes, dance, and entertainment with durations from 15 seconds to ten minutes. TikTok is the international version of Doujin, which was originally released in the Chinese market in September 2016. In 2017, TikTok was launched for iOS and Android in most markets outside of mainland China; however, it became available worldwide only after merging with another Chinese social media service, Musical.ly, on August 2, 2018.

51. TikTok has been downloaded more than 130 million times in the U.S. and it was ranked by Cloudflare as the most popular website of 2021. "TikTok was the world's most-visited website in 2021, overtaking YouTube in US watch time and Facebook in app downloads for the first time."[12]

---

[12] Emily Baker-White, *Inside Project Texas, TikTok's Big Answer To US Lawmakers' China Fears*, Buzzfeed, Mar. 10, 2022, https://www.buzzfeednews.com/article/emilybakerwhite/TikTok-project-texas-bytedance-user-data

52.     TikTok exclusively controls and operates the TikTok platform for profit, which creates advertising revenue through maximizing the amount of time users spend on the platform and their level of engagement. The greater the amount of time that young users spend on TikTok, the greater the advertising revenue TikTok earns.

53.     Users on TikTok who open the TikTok application are automatically shown an endless stream of videos selected by TikTok's technology to show content on each user's For You Page ("FYP") based upon each user's demographics, likes, prior activity on the app, and other factors and data points known only to TikTok.

54.     TikTok has designed its recommendation technologies (a/k/a algorithms) to addict users and cause them to spend as much time on the application as possible through advanced analytics that create a variable reward system tailored to user's viewing habits and interests. There are four main goals for TikTok's algorithm: which the company translates as "user value," "long-term user value," "creator value," and "platform value."

55.     An internal TikTok document was leaked, which document is titled "TikTok Algo 101." This document was created by TikTok's engineering team in Beijing and offers details about both the app's mathematical core and insight into the company's understanding of human nature. The document explains that in the pursuit of the company's "ultimate goal" of adding daily active users, it has chosen to optimize for two closely related metrics in the stream of videos it serves: "retention" — that is, whether a user comes back — and "time spent." The document offers a rough equation for how videos are scored, in which a prediction driven by machine learning and actual user behavior are summed up for each of three bits of data: likes, comments and playtime, as well as an indication that the video has been played.

56.     A recent Wall Street Journal report revealed how TikTok relies heavily on how much time users spend watching each video to steer them toward more videos that will keep them scrolling, and that process can sometimes lead young viewers down dangerous rabbit holes, and toward content that promotes suicide or self-harm.

57.     Another article, by the New York Times, explained how TikTok markets itself as

an "artificial intelligence company." "The most obvious clue is right there when you open the app: the first thing you see isn't a feed of your friends, but a page called 'For You.' It's an algorithmic feed based on videos you've interacted with, or even just watched. It never runs out of material. It is not, unless you train it to be, full of people you know, or things you've explicitly told it you want to see. It's full of things that you seem to have demonstrated you want to watch, no matter what you actually say you want to watch … Imagine a version of Facebook that was able to fill your feed before you'd friended a single person. That's TikTok." [13]

58.     TikTok's recommendation technologies also and often work in concert with other social media provider technologies. For example, a teen may first learn about a harmful topic through Meta's recommendation technologies on Instagram, which potential harm is then identified by TikTok's algorithm, based on any number of unknown factors, and the TikTok product will amplify and promote that same harm through a virtual series of how-to videos. These are inherently dangerous and harmful product features, particularly when aimed at children.

59.     TikTok also features and promotes various "challenges" where users film themselves engaging in behavior that mimics and "one ups" other users posting videos related to a particular challenge. TikTok promotes users creating and posting videos of challenges identified by a system of hashtags that are promoted within TikTok's search feature.

60.     TikTok's app and algorithm have created an environment in which TikTok "challenges" are widely promoted and result in maximum user engagement and participation, thus financially benefitting Defendants. At the same time TikTok "challenges" involve users filming themselves engaging in behavior that mimics and often times "one-ups" other users posting videos performing the same or similar conduct, and these TikTok "challenges" routinely involve dangerous or risky conduct.

61.     TikTok's    recommendation    technologies    present    these    often-dangerous "challenges" to users on their FYP and encourages users to create, share, and participate in the

---

[13] John Herrman, *How TikTok is Rewriting the World*, N.Y. Times, Mar. 10, 2019, *available at* https://www.nytimes.com/2019/03/10/style/what-is-tik-tok.html

"challenge."

62.     Moreover, TikTok's algorithm products suffer from serious algorithmic bias, including as it relates to race and low SES. Upon information and belief, TikTok is aware of these harms, including the fact that its algorithm pushes higher volumes of violent and dangerous content to members of protected classes. This is harmful content these users, users like the minor plaintiffs, would not have seen but for TikTok's product design and programming.

63.     Upon information and belief, the TikTok product is causing harms to protected classes based on their protected status, including the promotion and amplification of harmful and violent content in greater numbers to African American users.

64.     These are just some examples of how TikTok operates its product to generate profit, at the expense of the health and well-being of its users, particularly its child and teen users. And, of course, TikTok takes care to patent various aspects of its technologies. To name only a few examples (*see* https://patents.justia.com/assignee/beijing-bytedance-network-technology-co-ltd),

**Method and device for generating ranking model**
**Patent number:** 11403303
**Abstract:** The embodiment of the present application discloses a method and a device for generating a ranking model. A specific embodiment of the method includes: acquiring a sample set, executing following training steps: for the samples in the sample set, inputting the query information, the first position document and the second position document in the sample into an initial model, respectively obtaining scores of the input documents, and determining a target value of the sample based on the obtained scores, a clicked bias of a first position and an unclicked bias of a second position, updating the initial model based on the target value of each sample; determining whether the initial model is completely trained; and in response to determining that the initial model is completely trained, determining the updated initial model as the ranking model.
**Type:** Grant
**Filed:** September 7, 2018
**Date of Patent:** August 2, 2022
**Assignee:** BEIJING BYTEDANCE NETWORK TECHNOLOGY CO., LTD.
**Inventors:** Yang Wang, Ziniu Hu, Qu Peng, Hang Li

**Method and device for processing feature point of image**
**Patent number:** 11403835
**Abstract:** A method and a device for processing feature points of an image are provided. A specific embodiment of the method includes obtaining an image to be processed; determining weights of the feature points of the image to be processed to obtain a weight set; and according to the weights, selecting target numbered feature points as target feature points of the image to be processed. The weights include a texture weight; the texture weight and a color change scope of pixels in a target sized image region in which the feature points locate are directly proportional. The embodiment can reduce the number of feature points of the image, and further release the storage pressure of feature points regarding the image.
**Type:** Grant
**Filed:** December 10, 2018
**Date of Patent:** August 2, 2022
**Assignee:** BEIJING BYTEDANCE NETWORK TECHNOLOGY CO., LTD.
**Inventors:** Cheng Yang, Yi He, Lei Li

**Bidirectional optical flow based video coding and decoding**
**Patent number:** 11394991
**Abstract:** Devices, systems and methods for sample refinement and filtering method for video coding are described. In an exemplary aspect, a method for video processing includes modifying, for a conversion between a block of a video and a bitstream representation of the video, a refinement value for a prediction sample in the block by applying a clipping operation to refinement value. The refinement value is derived based on a gradient value of an optical flow coding process. An output of the clipping operation is within a range. The method also includes refining the prediction sample based on the refinement value and performing the conversion based on the refined prediction sample.
**Type:** Grant
**Filed:** August 18, 2021
**Date of Patent:** July 19, 2022
**Assignees:** BEIJING BYTEDANCE NETWORK TECHNOLOGY CO., LTD., BYTEDANCE INC.
**Inventors:** Hongbin Liu, Li Zhang, Kai Zhang, Jizheng Xu, Yue Wang

**Using interpolation filters for history based motion vector prediction**
**Patent number:** 11290712
**Abstract:** A method of video processing is provided to include: maintaining, prior to a conversion between a current video block of a video region and a coded representation of the video, at least one history-based motion vector prediction (HMVP) table, wherein the HMVP table includes one or more entries corresponding to motion information of one or more previously processed blocks; and performing the conversion using the at least one HMVP table; and wherein the motion information of each entry is configured to include interpolation filter information for the one or more previously processed blocks, wherein the interpolation filter information indicates interpolation filters used for interpolating prediction blocks of the one or more previously processed blocks.
**Type:** Grant
**Filed:** September 24, 2021
**Date of Patent:** March 29, 2022
**Assignees:** BEIJING BYTEDANCE NETWORK TECHNOLOGY CO., LTD., BYTEDANCE INC.
**Inventors:** Hongbin Liu, Li Zhang, Kai Zhang, Jizheng Xu, Yue Wang

**Method and an apparatus for displaying information flow, a storage, an electronic device**
**Patent number:** 11334707
**Abstract:** A method and an apparatus for displaying information flow, a storage medium and an electronic device are provided. The method includes: dividing a predetermined display time period for the first-type display information into multiple sub-time periods; determining, for the sub-time periods, a segmented display target of each piece of first-type display information in the sub-period based on a display target of the first-type display information in the predetermined display time period; and determining, for each display position, target display information to be allocated to the display position from the information flow, based on an estimated click-through rate of the display position, a proposed value of the second-type display information, historical display data of the first-type display information, and a segmented display target of the first-type display information in a current sub-time period.
**Type:** Grant
**Filed:** November 14, 2018
**Date of Patent:** May 17, 2022
**Assignee:** BEIJING BYTEDANCE NETWORK TECHNOLOGY CO., LTD.
**Inventors:** Shenke Xiao, Pingzhong Tang, Lihua Zhang, Xiwang Yang, Changsheng Gu

**Bi-prediction with weights in video coding and decoding**
**Patent number:** 11172196
**Abstract:** A video coding or decoding method includes using history-based motion vector prediction (HMVP) for conversion between multiple video blocks including a current block of video and a bitstream representation of the multiple video blocks such that for a uni-predicted block that for which a single reference picture is used for motion compensation, refraining from updating a look-up table for HMVP candidates for the uni-predicted block. The video coding or decoding method further includes performing the conversion using look-up tables for the multiple video blocks.
**Type:** Grant
**Filed:** October 20, 2020
**Date of Patent:** November 9, 2021
**Assignees:** BEIJING BYTEDANCE NETWORK TECHNOLOGY CO., LTD., BYTEDANCE INC.
**Inventors:** Li Zhang, Kai Zhang, Hongbin Liu, Yue Wang

**Display control method and apparatus for display interface of mobile terminal**
**Patent number:** 10908798
**Abstract:** A method and apparatus for controlling display of an interface in a mobile terminal are provided. The mobile terminal is communicatively connected to an external device. The method comprises: acquiring a pattern and/or a colour of the external device; and according to the pattern and/or the colour and the style categories of the display interface pre-stored in the mobile terminal, adjusting the current display style of the display interface, so as to enable the display style to match the pattern and/or the colour of the external device. In the display control method, the mobile terminal can adjust the display style of the display interface thereof according to the acquired pattern and/or colour of the external device, so as to enable the display style to match the pattern and/or the colour of the external device.
**Type:** Grant
**Filed:** April 25, 2014
**Date of Patent:** February 2, 2021
**Assignee:** BEIJING BYTEDANCE NETWORK TECHNOLOGY CO LTD
**Inventors:** Yonghao Luo, Zuohui Tian

65.     TikTok has also developed artificial intelligence technology that detects adult users of TikTok who send sexually explicit content to children and receive sexually explicit images from children. This technology furnishes TikTok with actual knowledge that a significant number of minor users of TikTok are solicited to send and actually do send sexually explicit photos and videos

of themselves to adult users in exchange for consideration in violation of 18 U.S.C. § 1591(a)(1)–(2). Yet, TikTok uses this technology selectively and only when it is to the benefit of TikTok, enabling harms through its social media products in the interest of engagement.

66.     TikTok markets itself as a family friendly social media application, and markets to children and teens.

67.     TikTok exclusively controls and operates the TikTok platform for profit, which like Instagram, creates advertising revenue through maximizing the amount of time users spend on their platforms. Accordingly, while TikTok purports to have a minimum age requirement of 13-years-old, it does little to verify user age or enforce its age limitations despite knowledge that underage use is widespread.

68.     In fact, underage TikTok users will often post videos of themselves in which they clearly are not old enough to be using the TikTok social media product. On information and belief, TikTok's sophisticated algorithms can identify when a user has crooked teeth or a crack in their bedroom wall, so there is little question that those same algorithms can identify underage children in posted videos. But also, TikTok has actual knowledge of underage users. For example, in July 2020, TikTok reported that more than a third of its 49 million daily users in the United States were 14 years old or younger. And while some of those users were 13 or 14, at least one former employee reported that TikTok had actual knowledge of children even younger based on videos posted on the TikTok platform – yet failed to promptly take down those videos or close those accounts.[14] In fact, TikTok regularly knows or should know of underage users with accounts and who post videos on its platform, whether because of its algorithms, viewing by TikTok employees, and/or flagging by other TikTok users. In many such instances, TikTok does not suspend the account, require age verification, or notify the underage user's parents of such prohibited use.

69.     TikTok does not seek parental consent for underage users or provide warnings or adequate controls that would allow parents to monitor and limit the use of TikTok by their children.

---

[14] Raymond Zhong & Sheera Frenkel, *A Third of TikTok's U.S. Users May Be 14 or Under, Raising Safety Questions*, N.Y. Times, Aug. 14, 2020, *available at* https://www.nytimes.com/2020/08/14/technology/TikTok-underage-users-ftc.html

TikTok does not verify user age, enabling and encouraging teens and children to open TikTok accounts, providing any age they want, without parental knowledge or consent.

70.     Further, based on TikTok data leaked to the New York Times, internal TikTok documents show that the number of daily U.S. users in July of 2020 estimated by TikTok to be 14 or young—18 million—was almost as large as the number of over-14 users, around 20 million. While the rest of TikTok's U.S. users were classified as being "of unknown age."[15]

71.     TikTok also does not rely on users' self-reported age to categorize them and knows when it has underage users engaged in harmful activities on its platform. TikTok has algorithms through which is creates estimated or approximate age for its users, including facial recognition algorithms that scrutinize profile pictures and videos, as well as other methods through which it can estimate age with reasonable certainty. TikTok knows that users under the age of 13 are using its social media product, including to post videos of themselves, which videos are public by default and result in harm to these underage users.[16]

72.     TikTok has tried to boost engagement and keep young users hooked to its social media product by any means necessary.

73.     TikTok has developed images and memes to enact images for users to decorate the videos they post. TikTok has also developed memes and other images for users to apply to images they post on TikTok. TikTok also has acquired publication rights to music that its users can incorporate in the pictures and videos they post on TikTok. When users incorporate images, memes and music supplied by TikTok into their postings, TikTok becomes a co-publisher of such content. A TikTok user who incorporates images, memes and musical content supplied by TikTok into their posts is functionally equivalent to a novelist who incorporates illustrations into her story. TikTok can no longer characterize the images, memes, and musical content it supplies to its users as third-party content as the novelist can disclaim responsibility for illustrations contained in her book.

74.     TikTok contracts for legal rights to this third-party content, such that it is not "third-

---

[15] *Id.*

[16] *Id.*

party content" at all. TikTok's current Terms of Service grant TikTok sweeping sets of rights as follows, and for example only,

> You or the owner of your User Content still own the copyright in User Content sent to us, but by submitting User Content via the Services, you hereby grant us an unconditional irrevocable, non-exclusive, royalty-free, fully transferable, perpetual worldwide licence to use, modify, adapt, reproduce, make derivative works of, publish and/or transmit, and/or distribute and to authorise other users of the Services and other third-parties to view, access, use, download, modify, adapt, reproduce, make derivative works of, publish and/or transmit your User Content in any format and on any platform, either now known or hereinafter invented.

75. TikTok directly profits from the videos and pictures and other content its users create in collaboration with TikTok, as described above.

76. The TikTok product is used by many millions of children every day, children who have become addicted to the product a result of its design and product features, children like T.R., to the point where parents cannot remove all access to the TikTok product without self-harm, suicide, and other foreseeable consequences of serious addiction, and where such cessation of use would require professional intervention

**C.     Snap, Inc. and its Snapchat product**

77. Snapchat was founded in 2011, by three Stanford college students, and quickly became a wildly popular social media product among U.S. teens. It is one of the most widely used social media products in the world and is used by more than 69% of all U.S. teens (age 13 to 17).[17] Snapchat's headquarters is in Santa Monica, California.

78. Snapchat started as a photo and short video sharing social media application that allows users to form groups and share posts or "Snaps" that disappear after being viewed by the recipients. The Snapchat product became well-known for its self-destructing content feature. Specifically, the Snapchat product allows users to form groups and share posts or "Snaps" that disappear after being viewed by the recipients. However, the Snapchat social media product quickly evolved from there, as its leadership made design changes and rapidly developed new product features intended to and that did increase Snapchat's popularity among teen users.

---

[17] *See* https://www.smartinsights.com/social-media-marketing/social-media-strategy/snapchat-statistics/

79.     In 2012, Snap added video capabilities to its Snapchat product, pushing the number of "snaps" to 50 million per day; in 2013, "Stories" and "Chat" features; in 2014, live video chat capabilities, "Our Story," Geofilters and Community Geofilters, and Snapcash.

80.     By 2015, advertisements were pervasive on Snapchat and, by 2018, 99% of Snap's total revenue came from advertising, according to internal company records. In other words, like Meta, Snap decided to monetize its userbase and, from that point forward, began changing its product in ways that made its product even more harmful to users but that paved the way for growth, engagement, and profits for Snap and its leadership and investors.

81.     By 2015, Snapchat had over 75 million monthly active users and was the most popular social media application amongst American teenagers in terms of number of users and time spent using the platform. Snap currently estimates having between 92.8 and 96.6 million users in the United States, with at least 17 to 17.7 million of those being children under the age of 18. Against this backdrop, Snap advertises and promotes its product as safe and fun—which could not be further from the truth.

82.     Snap uses an algorithm or similar technology to suggest connections, that is, Snap sends messages to users based on some secret formula Snap uses to determine whether someone should "friend" someone else. This is known as "Quick Add," and these Snap-initiated messages result in exposure to harmful contacts, bullying, and dangerous predators. This feature contributes nothing to the product itself and serves no informational or communication purpose. Similar to Meta's product, this product is designed to reinforce addiction and increase the odds of maintaining more users for longer.

83.     Snapchat users also have an "Explore" feed that displays content created by other users around the world. These product features are designed to grab and keep users' attention for as long as possible each day, and have led many people, from psychologists to government officials, to describe Snapchat as "dangerously addictive."

84.     As with Defendants Meta and TikTok, Snap's algorithms and/or similar technologies determine the content that gets directed and/or populates its user experience on the Snapchat social media product. This includes content sent directly from Snap to its users, for

Snap's own purposes, and prior to any sort of user search or request for such content. And as with Defendants Meta and TikTok, Snap knows or should know that its algorithms are promoting and amplifying harmful content to children and teens and are operating with a degree of algorithmic discrimination that is particularly harmful to Snap's most vulnerable user groups.

85. Snapchat offers several unique messaging and data features. It is perhaps most famous for its self-destructing content design feature, which appeals to minors and makes it more difficult for parents to monitor their children's social media activity. This is an inherently dangerous product feature because it both encourages and allows minor uses to exchange harmful, illegal, and sexually explicit images with adults, and provides those same adults with a safe and efficient vehicle to recruit victims. Snapchat is a go-to application for sexual predators because of this product feature.[18]

86. For years Snap has received reports of child abuse and bullying occurring through its product and because of its product features,[19] yet has kept those features in place as removing them would result in considerable impact on the popularity of Snap's social media product.

87. Harmful and dangerous interactions likewise occur because of these and other Snapchat messaging features, which provide direct and unsupervised access to children and teens.

88. But also, this is a dangerous product feature because it does not operate as advertised. Snap's disappearing design and marketing of this feature is particularly harmful to teens who rely on Snap's representations when taking and sending photos, only learning after the fact that recipients have means to save photos – and are often bullied, exploited, and/or sexually abused as a direct result. These are harms known to Snap.

89. In 2014, Snapchat added "Stories" and "Chat" features that allowed users to post longer stories that could be viewed by users outside the user's friends. As with Meta's algorithms, Snap's technology promotes and amplifies harmful content as a means of increasing user engagement and growth opportunities. Snap has actual knowledge of the harm it is causing its

---

[18] *See, e.g.*, https://phonespector.com/blog/what-are-the-dangers-of-snapchat-to-avoid/

[19] *See, e.g.*, https://www.forbes.com/sites/zakdoffman/2019/05/26/snapchats-self-destructing-messages-have-created-a-haven-for-child-abuse/?sh=411b8e1d399a (Snapchat Has Become A 'Haven for Child Abuse' With Its 'Self-Destructing Messages').

users, and consistently prioritizes its own profits regardless.

90. Snapchat also allows users to enable the sharing of their location, through a tool called Snap Map, which allows the users' followers (and the public for Snaps submitted by the users) to see the user's location on a map. At all times relevant, this feature was available to all users, including minors. This is an inherently dangerous product feature, which serves no practical purpose – but that does provide strangers and predators with access to the location of minor victims. This product feature has directly contributed to stalking and other, physical harms and assaults perpetrated on minors, and these are harms known to Snap.

91. But also, Snap has developed artificial intelligence technology that detects adult users of Snapchat who send sexually explicit content to children and receive sexually explicit images from children. This technology furnishes Snap with actual knowledge that a significant number of minor users of Snapchat are solicited to send, and do send, sexually explicit photos and videos of themselves to adult users in violation of 18 U.S.C. § 1591(a)(1)-(2). Snap *could* protect its minor users, but in many instances, does not.

92. Snap also has a "My Eyes Only" product, which many parents do not know about. Snap's My Eyes Only Product encourages and enables young users to hide harmful content from parents by allowing them to hide content in a special tab that requires a passcode, and where content cannot be recovered – even by Snap itself – without the correct passcode. The content self-destructs if a user attempts to access the hidden folder with the wrong code. My Eyes Only has no practical purpose or use, other than to hide potentially harmful content from parents and/or legal owners of the devices used to access Snap. Moreover, while this information and evidence should be in Snap's possession and control, it has designed thus product in a way that causes the permanent loss of relevant and often incredibly material and incriminating evidence in the event of products liability lawsuit, like this one.

93. On information and belief, Snap's disappearing messages are defective for this reason as well. Snap has possession, custody, or control of that data, knows that it will be relevant and material in the event of products liability litigation, but has designed its technologies – *i.e.* its advertised "disappearing" functionality which suggests that Snap itself no longer has access to

such data – in a manner that frustrates and actively prevents parents from monitoring the activity of their underage children on Snap's social media product. These are serious defects, which Snap should be required to remedy immediately.

94.     Like Meta and TikTok, Snap also sends push notifications and emails to encourage addictive behavior and to increase use of its Snapchat product. Snap's communications are triggered and based upon information Snap collects from and about its users, and Snap "pushes" these communications to teen users in excessive numbers and disruptive times of day. These notifications are specifically designed to, and do, prompt them to open Snapchat and view the content Snapchat selected, increasing sessions, and resulting in greater profits to Snap. Even the format of these notifications has been designed to pull users back on to the social media platform—irrespective of a user's health or wellbeing.

95.     The Snapchat social media product also features a series of rewards including trophies, streaks, and other signals of social recognition like the "likes" metrics available across other platforms. These features are designed to encourage users to share their videos and posts with the public. Moreover, these features serve no communication or informational purposes. They are designed to be addictive, and to encourage greater use of the Snap product without regard to any other content or third-party communication. But also, they have been repeatedly recognized by organizations and even government agencies around the world as being among the most addictive products when it comes to teen social media users.

96.     These product features serve no purpose other than creating dependencies on Snap's product by children and teens, which dependencies in turn cause sleep deprivation, anxiety, depression, anger, shame, interpersonal conflicts, and other serious harms to mental and physical health.

97.     Snapchat incorporates several other product features that serve no functionality purpose, but that do make Snap's product more appealing to children and teens (*i.e.*, avatars, emojis, and games) while simultaneously using known mechanisms to addict those same children and teens (*i.e.* streaks and trophies offering unknown rewards). These features and the ones discussed above were particularly addictive to E.R. and were targeted to underage users like E.R.

98.     The Snap Streak feature is unique to Snap's product and is one of the most – if not the most – addictive products available "especially to teenagers."[20] *See also* FBD 37/21, "Teen Meaningful Interactions and Feed post Feedback – Focus Groups" (May 2018), at p. 5 ("Streaks are a very important way for teens to stay connected. They are usually with your closest friends and they are addictive.") Snap knows that its Snap Streak product is addictive and has known for years but continues to provide that product to teens and children.

99.     These are just some examples of Snapchat's harmful product features.

100.     Snap has also developed images for users to decorate the pictures or videos they post, and Snap has developed Lenses which are augmented reality-based special effects and sounds for users to apply to pictures and videos users post on Snapchat, and World Lenses to augment the environment around posts. Snap also has acquired publication rights to music, audio, and video content that its users can incorporate in the pictures and videos they post on Snapchat.

101.     These images, Lenses, and licensed audio and video content supplied and created by Snapchat frequently make a material contribution to the creation or development of the user's Snapchat posts. Indeed, in many cases, the *only* content in a user's Snapchat post are images, Lenses, and licensed audio and video content supplied and created by Snapchat. When users incorporate images, Lenses, music, audio, and video content supplied by Snapchat posts, Snapchat makes a material contribution to the creation and/or development of their Snapchat postings and becomes a co-publisher of such content. When malign users incorporate images, Lenses, music, audio, and video content supplied by Snapchat to their posts, this enhances the psychic harm and defamatory sting that minor users experience from third-party postings on Defendant's platform.

102.     Moreover, Snap contracts for legal rights in this third-party content, such that it is not "third-party content" at all. Snap's current Terms of Service grant Snap several, sweeping sets of legal rights, from licensing to ownership, as follows (and for example only as there are several provisions in Snap's Terms of Service that address legal rights over user content, comments, and other usage and activities),

---

[20]*See* https://abcnews.go.com/Lifestyle/experts-warn-parents-snapchat-hook-teens-streaks/story?id=48778296

## 3. Rights You Grant Us

Many of our Services let you create, upload, post, send, receive, and store content. When you do that, you retain whatever ownership rights in that content you had to begin with. But you grant us a license to use that content. How broad that license is depends on which Services you use and the Settings you have selected.

For all content you submit to the Services, you grant Snap and our affiliates a worldwide, royalty-free, sublicensable, and transferable license to host, store, cache, use, display, reproduce, modify, adapt, edit, publish, analyze, transmit, and distribute that content. This license is for the purpose of operating, developing, providing, promoting, and improving the Services and researching and developing new ones. This license includes a right for us to make your content available to, and pass these rights along to, service providers with whom we have contractual relationships related to the provision of the Services, solely for the purpose of providing such Services.

103.    Snap directly profits from the videos and pictures and other content its users create in collaboration with Snap, as described above

104.    Snap knows that it is harming teens yet consistently opts for prioritization of profit over the health and well-being of its teen users.

105.    Millions of teen and children use Snap's inherently dangerous and defective social media product every, single day.

**D.     Defendants Designed Inherently Dangerous Products and Failed to Warn**

106.    Defendants' social media products contain countless features that serve no critical purpose relating to product functionality or a user's ability to access other users' content. While this complaint addresses known features, on information and belief, there are countless other features currently unknown to Plaintiffs for the simple reason that these Defendants have concealed the truth and operate with zero transparency. Upon information and belief, it is in the public interest for this Court to permit discovery of all such product features and processes. The following describe just some such features and defective designs.

107.    Defendants design their products to evade parental consent and control.

108.    Defendants claim to impose age restrictions for use of their products, including that users must be at least 13 and must (or should, in the case of Defendant Meta) obtain parental

consent if under the age of 18. Nevertheless, Defendants provide access to millions of minors who are under 13, or under 18, but lack parental consent. Defendants know or should know that these users are not duly authorized but provide them with access regardless and do so because Defendants view children and teens as valuable assets. Defendants have turned a blind eye in the name of corporate profit.

109. For example, in the case of Defendant Meta, Meta has and utilizes technologies that can ascertain the actual age of each user (referred to by Meta as the approximate or estimated age) with reasonable certainty. In the United States (where Meta can collect personal and private data to an unprecedented degree), Meta uses these technologies for assessment and advertising purposes. Such use results in internal documents and assessments of underage users, including users at least as young as 10 years old. Despite having actual data confirming the existence of underage users (children who do not belong on Meta's platforms), Meta takes no action – it takes no action because it is making considerable sums of money from these unauthorized (if not unlawful) accounts.

110. Defendants TikTok and Snap also have actual knowledge of underage users.

111. Defendants design their products to encourage and aid users' evasion of parental oversight and do not notify parents concerning the amount of time their children spend on their platforms, what hours of the day they are connected, or when they are contacted or solicited by adults. Defendants do not verify emails or phone numbers, permit and encourage multiple accounts (with the knowledge that children use these multiple account features to hide accounts from their parents), and otherwise refuse to enforce their age limitations in any reasonable or meaningful manner.

112. Defendants' public profile settings are inherently dangerous and defective when utilized in connection with minor users. Until mid-2021, for example, Defendant TikTok made all users' profiles "public" by default. Public profile settings allow strangers to view and message underage users, which Defendants determined to be good for engagement. However, this means that they are exposing children to strangers in a manner against which parents cannot protect. Each

of these defendants could set all minor accounts to private by default and, even better, each of these defendants could restrict all minor accounts to private until the user reaches the age of majority.

113.   Public default settings are unnecessary and serve no critical purpose as to product functionality or a user's ability to access content posted by other users. They do, however, encourage and provide adult users the ability to identify and access, minors for the purpose of sexual abuse and exploitation—a dangerous defect known to these Defendants.

114.   Defendants' direct messaging and recommendation technologies are inherently dangerous and defective when utilized in connection with minor users.

115.   Defendants' direct-messaging products provide other users—including anonymous and semi-anonymous adult users, bullies under the age of eighteen, and any other stranger for whom a parent would not allow access—with unrestricted and unsupervised access to minor users. Minor users lack the cognitive ability and life experience to identify online grooming behavior by prurient adults and the psychosocial maturity to decline invitations to exchange salacious material and mass-messaging capabilities. Defendants' products further allow direct messaging with and by minors without parental notification.

116.   Defendants' direct messaging products are unnecessary and serve no critical purpose as to product functionality or a user's ability to access content posted by other users. They are, however, incredibly profitable in terms of engagement and retention of teen users; as well as engagement and retention of adult users who want access to vulnerable children and teens outside the purview of their parents.

117.   Each of these defendants could restrict direct messaging products so that minor users could only send or receive direct messages with persons approved by their parents and/or already on their "friend" list or equivalent. They chose to not do so for economic reasons – their economic reasons, not those of their users.

118.   Defendants also employ recommendation technologies, affirmatively sending recommendations to users regarding people or groups they should "friend," join, or otherwise

connect. These technologies function in a similar (if not the same) manner. Specifically, user data and other information obtained through Defendants' data collection technologies (including information such as age and gender) affirmatively directs users to one another, and pushes messages recommending that the users connect, follow, friend, or otherwise interact.

119.    Defendants know that these user recommendation technologies facilitate and contribute to most of the adult/minor grooming and exploitation that occurs on their platform. In Meta's case, the estimate is upwards of 70%. To be clear, this means that Defendants' technologies, processes, and related devices are affirmatively finding, recommending, and connecting predatory adult users to vulnerable minors, the Defendants know their technologies is causing these harms, and that Defendants continue to utilize these technologies regardless and because they are otherwise good for Defendants' business.

120.    Moreover, each of the above products is dangerous alone, but they are substantially more dangerous when combined. For example, Defendants' direct-messaging products are more dangerous when coupled with minor accounts of which parents have no knowledge (or means to monitor) and do not consent; and when combined with Defendants' public profile and recommendation features.

121.    These direct-messaging and recommendation features connect complete strangers who would otherwise have no contact, but they serve no purpose as to platform functionality or the ability to access content posted by others. They do, however, increase Defendants' engagement (and profits) by serving up photos of minors to complete strangers and then providing those same complete strangers with unsupervised access to those minors.

122.    Defendants design countless addictive product features, which features are meant to result in user dependencies, particularly among minors. Defendant all know that these features are addictive, in many cases have been asked to fix and/or remove such features, and in all cases have chosen profits over user safety and wellbeing. These addictions among U.S. children and teens are an epidemic, and a deadly one at that.

123.    Defendants' selection and recommendation technologies select content for minor

users for the express purpose of habituating users to the Defendants' social media products. These technologies create addiction in minor users on a content-neutral basis by adapting to promote whatever content will trigger minor users' engagement and maximize their screen time. Defendants have purposely designed their products to increase users' engagement, and refuse to redesign their products, despite their knowledge of severe user harm resulting from this design.

124.    Defendants have purposely designed their products to be as addictive as possible and have actual knowledge of the harm these addictive features cause.

125.    Defendants use unknown and changing rewards that are designed to prompt users who use their products in excessive and dangerous ways. Defendants knowingly or purposely designed their products to encourage addictive behaviors. For example,

126.    Facebook and Instagram are designed around a series of features that do not add to the communication utility of the applications, but instead seek to exploit minor users' susceptibility to persuasive design and unlimited accumulation of unpredictable and uncertain rewards. Examples of this include but are not limited to "likes," "followers," algorithm-controlled feed, and unlimited scrolling features.

127.    Snap likewise seeks to exploit minor users' susceptibility to persuasive design and unlimited accumulation of unpredictable and uncertain rewards. Snap promotes the use of Snap Streaks to keep children returning to the platform on a daily basis and encourages uses by offering badges and rewards for "accomplishments" that are not known or publicized ahead of time.

128.    TikTok has designed its recommendation technologies to addict users and cause them to spend as much time on the application as possible through advanced analytics that create a variable reward system tailored to users' viewing habits and interests. TikTok also offers unlimited scrolling features.

129.    Defendant Meta performed extensive testing on its "like" button feature. Meta determined that its "like" product feature is a source of social comparison harm for many of its users. This is not surprising given that several of the Meta employees involved in creating that feature have since left Meta and have spoken publicly about the product's addictive nature and

harmfulness.[21] What is unacceptable, however, is that Meta knows that its product feature is harmful, particularly to teen girls and young women, [22] and could easily hide or remove that product feature, but does not for fear that hiding "likes" would result in lower engagement and less advertising revenue. This is a blatant example of Defendants choosing their own profits over human life and, specifically, the health and well-being of a significant number of teens.

130.    These product features serve no purpose other than creating dependencies on Defendants' products by children and teens, which dependencies in turn cause sleep deprivation, anxiety, depression, anger, shame, interpersonal conflicts, and other serious harms to mental and physical health.

131.    Defendants send push notifications and emails to encourage addictive behavior and to increase use of their social media products. Defendants' communications are triggered and based upon information each of these defendants collects from and about their users, and Defendants "push" these communications to teen users in excessive numbers and disruptive times of day. These notifications are specifically designed to, and do, prompt them to open Defendants' social media products and view the content Defendants selected, increasing sessions, and resulting in greater profits to Defendants. Even the format of these notifications has been designed to pull users back on to the social media platform— irrespective of a user's health or wellbeing.

132.    Defendants' content recommendation systems identify and promote harmful content. Defendants purposefully program these systems to prioritize number of interactions and not quality of interactions. Worded otherwise, Defendants promote and amplify content based on engagement objectives and not the health and well-being of users, which renders their social media products inherently dangerous and defective, particularly when used by teens and children.

133.    In 2021, Senators Richard Blumenthal, Marsha Blackburn and Mike Lee tested and

---

[21] *See, e.g.*, https://www.theguardian.com/technology/2017/oct/05/smartphone-addiction-silicon-valley-dystopia.

[22] *See, e.g.*, the documents disclosed at https://digitalwellbeing.org/wp-content/uploads/2021/10/Facebook-Files-Appearance-based-Social-Comparison-on-Instagram-.pdf, *supra*.

confirmed the fact that Meta's recommendation-based feeds and product features promote harmful content by having several accounts opened while providing information indicating that the users were teenage girls,

> "Within an hour all of our recommendations promoted pro-anorexia and eating disorder content," Blumenthal said. "Nothing has changed. It's all still happening."
>
> Sen. Mike Lee, R-Utah, said his office created an account for a 13 year old girl. Shortly afterward, the algorithm recommended a famous female celebrity to follow and when they did, Lee said, "It went dark fast."
>
> The fake account was flooded with content about diets, plastic surgery and other damaging material for an adolescent girl, he said.
>
> In another example this week, Blackburn's staff exposed a flaw in Instagram's setting for teens under 16.
>
> According to Instagram's policies, new teenage accounts should automatically default to a private setting. But when Blackburn's team set up a phony account for a 15 year old girl, it automatically defaulted to public.
>
> Mosseri acknowledged the error, explaining the mistaken default setting was triggered because the account was created on a web browser, as opposed to a mobile app.
>
> "We will correct that," he said.

*See* https://www.npr.org/2021/12/08/1062576576/instagrams-ceo-adam-mosseri-hears-senators-brush-aside-his-promises-to-self-poli.

134.    Meta's recommendations are not coincidence, nor are they the product of third-party speech or even Meta's speech. Meta is exerting a degree of manipulation and control over its users via its unchecked technologies that far exceeds anything the world could have contemplated even a decade ago. Meta regularly "experiments" on users—users with no idea that they are being monitored and examined—to test product ideas, but also, to identify mechanisms through which Meta can control user behavior for its own profit. Moreover, Meta is not targeting millions, thousands, or even hundreds of users with its product. Meta's technologies allow it to

target every single user (billions of people) simultaneously and on an individual basis, which fact makes its algorithmic and social media products far more dangerous than anything American courts or lawmakers have ever seen or could even have conceived of until Meta's internal documents were released in late 2021. Even now, there are tens of thousands if not millions of additional Meta documents and data sources that the world will need to see to fully appreciate and understand how Meta's products function and what Meta (and its primary competitors in the social media industry) have knowingly done to our children and teens.

135. Nor is Defendant TikTok any different. In December 2021, the Wall Street Journal published an article about TikTok and how it sends kids down dangerous rabbit holes, including eating disorders. The article is titled "'The Corpse Bride Diet': How TikTok Inundates Teens With Eating-Disorder Videos." *See* *https://www.wsj.com/articles/how-TikTok-inundates-teens-with-eating-disorder-videos-11639754848* ("TikTok is flooding teen users with videos of rapid-weight-loss competitions and ways to purge food that health professionals say contribute to a wave of eating-disorder cases spreading across the country.").

TECH

# 'The Corpse Bride Diet': How TikTok Inundates Teens With Eating-Disorder Videos

The app's algorithm can send users down rabbit holes of narrow interest, resulting in potentially dangerous content such as emaciated images, purging techniques, hazardous diets and body shaming

By *Tawnell D. Hobbs* Follow , *Rob Barry* Follow and *Yoree Koh* Follow
Dec. 17, 2021 10:45 am ET

> TikTok is flooding teen users with videos of rapid-weight-loss
> competitions and ways to purge food that health professionals say
> contribute to a wave of eating-disorder cases spreading across the
> country.
>
> A Wall Street Journal investigation involving the creation of a dozen
> automated accounts on TikTok, registered as 13-year-olds, found that
> the popular video-sharing app's algorithm served them tens of
> thousands of weight-loss videos within a few weeks of joining the
> platform.
>
> Some included tips about taking in less than 300 calories a day,
> several recommended consuming only water some days, another
> suggested taking laxatives after overeating.
>
> Other videos showed emaciated girls with protruding bones, a "corpse
> bride diet," an invitation to a private "Christmas-themed
> competition" to lose as much weight as possible before the holiday
> and a shaming for those who give up on getting thin: "You do realise
> giving up after a week isn't going to get you anywhere, right?...You're
> disgusting, it's really embarrassing."

136.    Like Meta, TikTok is willing to addict and harm users if it means TikTok's own long-term success.

137.    Defendants are aware of the harms their content recommendation technologies cause and chose to not disclose those harms or fix their technologies – for example, by programming their systems for safety or user benefit over profit or by simply not using those systems, which serve no practical function, in the case of minor users. For these reasons, the harms were unknown to all users and could not reasonably be avoided.

138.    More to the point, Defendants' content recommendation technologies serve no countervailing benefit to consumers. Users are perfectly capable of running their own searches, as they do with any number of available search engines. And if the harmful third-party content were being provided in that manner – *i.e.* if this was content requested and sought out by users as opposed to content identified and force fed to users as means to make Defendants more money – it would not be at issue in this case.

139.    Defendant Meta's group recommendation systems also direct users, including children and teens, to harmful and in some cases deadly groups. Meta is aware of these harms but has also determined that the more users it can connect to one another (including adult and child

connections) the more likely it is to retain those users for the long term. This includes predators. That is, Meta has implicitly (if not explicitly) determined that helping predators find children is good for its bottom line.

140.    These are just known examples, and Plaintiffs belief that they will identify other examples of harmful product features through discovery in this case.

141.    What is known is that Defendants have deliberately designed their products this way to increase engagement; employ invasive, surreptitious means to operate these technologies; fail to warn users or their parents of these dangers known only to Defendants; and refuse to restrict their use of these products in connection with minors' accounts or otherwise make these products safe, despite knowledge of the harms perpetrated on American youth in general and on Plaintiffs in particular.

142.    The cost of designing safer products and fixing known defects is negligible. In fact, each of the above examples could be addressed in a matter of hours, not days. These products serve no purpose for consumers, and the benefit of making the necessary changes would be high in terms of reducing the quantum of mental and physical injury sustained by minor users and their families.

143.    But also, each of these Defendants has developed artificial intelligence technology that detects adult users of who send sexually explicit content to children and receive sexually explicit images from children. These technologies furnish Meta, Snap and TikTok with actual knowledge that a significant number of minor users of their products are solicited to send, and do send, sexually explicit photos and videos of themselves to adult users in violation of 18 U.S.C. § 1591(a)(1)-(2). Defendants *could* protect their minor users, but in many instances, do not.

144.    Meta, Snap and TikTok target and market to teens and children, and deliberately designed their products in a manner intended and that does make it easier for these underage users to open social media accounts.

145.    Users under the age of 18 make up a significant percentage of all social media users in the United States and represent Defendants' only significant opportunity for growth due to saturation of the adult market. Meta, Snap and TikTok see them as a gateway for other potential

users. U.S. teens also are the most lucrative for Defendants when it comes to advertising revenue.

**E.    Defendants' Social Media Products are Products**

146.    Meta's social media applications Facebook and Instagram, Snapchat and TikTok are products that are designed and manufactured by Meta, Snap and TikTok, respectively. These products are designed to be used by children and are actively marketed to children throughout the world.

147.    Defendants' products are designed to be used by minors and are actively marketed to minors across the United States. Defendants market to minors through their own marketing efforts and design. But also, Defendants work with and actively encourage advertisers to create ads targeted at and appealing to teens, and even to children under the age of 13. Defendants spend millions of dollars researching, analyzing, and experimenting with young children to find ways to make their products more appealing and addictive to these age groups, as these age groups are seen as the key to Defendants' long-term profitability and market dominance.

148.    Defendants are aware that large numbers of children under the age of 18 use their products without parental consent. They design their products in a manner that allows and/or does not prevent such use to increase user engagement and, thereby, their own profits.

149.    Defendants are aware that large numbers of children under the age of 13 use their products despite user terms or "community standards" that purport to restrict use to individuals who are 13 and older. They have designed their products in a manner that allows and/or does not prevent such use to increase user engagement and, thereby, their own profits.

150.    Defendants refer to these social media products and product features as "products," and further, go to great lengths and expense to patent several aspects of their algorithms and other technologies – which patents Defendants could not obtain for abstract ideas and/or speech.

**F.    Defendants' Business Model is Based on Maximizing User Screen Time**

151.    Defendants advertise their products as "free" because they do not charge their users for downloading or using their products. What many users do not know is that, in fact, Defendants make a profit by finding unique and increasingly dangerous ways to capture user attention and target advertisements to their users. Defendants receive revenue from advertisers who pay a

premium to target advertisements to specific demographic groups of users in the applications. Defendants also receive revenue from selling their users' data to third parties.

152. The amount of revenue Defendants receive is based upon the amount of time and level of user engagement on their platforms, which directly correlates with the number of advertisements that can be shown to each user.

153. Defendants use unknown and changing rewards that are designed to prompt users who consume their social media products in excessive and dangerous ways. Defendants know, or in the exercise of ordinary care should know, that their designs have created extreme and addictive usage by their minor users, and Defendants knowingly or purposefully designed its products to encourage such addictive behaviors. This design conforms to well-established principles of operant conditioning wherein intermittent reinforcement provides the most reliable tool to maintain a desired behavior over time.

154. Meta's social media products, Snapchat and TikTok are designed around a series of features that do not add to the communication utility of the application, but instead seek to exploit minor users' susceptibility to persuasive design and unlimited accumulation of unpredictable and uncertain rewards, including "likes," "Snapstreaks" and "followers." In the hands of children, this design is unreasonably dangerous to the mental well-being of underage users' developing minds.

155. According to industry insiders, Meta, Snap and TikTok have employed thousands of psychologists and engineers to help make their products maximally addicting. For example, Instagram's "pull to refresh" is based on how slot machines operate. It creates an endless feed, designed to manipulate brain chemistry and prevent natural end points that would otherwise encourage users to move on to other activities.

156. Again, the amount of revenue Defendants receive is based upon the amount of time and user engagement on their platforms, which directly correlates with the number of advertisements that can be shown to each user. In short, Meta, Snap and TikTok opted for user engagement over the truth and user safety.

157. Meta, Snap and TikTok know that their products are addictive, and that millions of

teen users want to stop using them but cannot.

158.    Meta, Snap and TikTok engineer their products to keep users, and particularly young users, engaged longer and coming back for more. This is referred to as "engineered addiction," and examples include features like bottomless scrolling, tagging, notifications, and live stories.

159.    Meta, Snap and TikTok spend billions of dollars marketing their products to minors and have deliberately traded in user harm for the sake of their already astronomical revenue stream.

**G.    Defendants Designed Complex Recommendation Technologies to Addict Teen Users**

160.    Meta, Snap and TikTok have intentionally designed their products to maximize users' screen time, using complex algorithms designed to exploit human psychology and driven by the most advanced computer algorithms and artificial intelligence available to some of the largest technology companies in the world.

161.    Meta, Snap and TikTok's recommendation systems select content for minor users not based on what they anticipate the user will prefer or to enhance their social media experience, but rather for the express purpose of habituating users to the Defendants' social media products. Defendants' algorithms do not provide a neutral platform but rather specify and prompt the type of content to be submitted and determine particular types of content its systems promote.

162.    In the words of one, high-level departing Meta employee,

In September 2006, Facebook launched News Feed. In October 2009, Facebook switched from chronological sorting to an algorithmic ranking. 10 years later, in July 2019, Sen. Josh Hawley introduced a bill to the US Senate that would ban features in app feeds, such as infinite scroll.

The response in 2006 was largely positive; the response in 2009 was negative from a vocal minority, but still largely positive; the response in 2019 was largely "lol, wut?" If I had to guess, the response to government regulation around engagement centric information feeds in 2026 will be "Omg finally".

"Why We Build Feeds" (October 4, 2019), at p. 1.[23]

163.   Defendants designed and have progressively modified their products to promote problematic and excessive use that they know is indicative of addictive and self-destructive use.

164.   One of these features—present in Meta's social media products, Snapchat and TikTok—is the use of complex recommendation systems to select and promote content that is provided to users in an unlimited and never-ending "feed." For example, the Snapchat "Discover" feature allows Snapchat users to view Snapchat "Stories" selected by Snapchat from users they do not follow. Defendants are aware that algorithm-controlled feeds promote unlimited "scrolling"—a type of use those studies have identified as detrimental to users' mental health—however, this type of use allows Defendants to display more advertisements and obtain more revenue from each individual user.

165.   Defendants also know that content that generates extreme psychological reactions in minor users is more likely to trigger their engagement than content that is benign. Defendants have designed algorithm-controlled feeds to promote content most likely to increase user engagement, which often means content that Defendants know to be psychologically stressful to their users. Content is selected not just based on individual users' viewing history but also on the viewing history of their linked friends. Users are exposed to massive amounts of content that they would otherwise never see but for Defendants' affirmative pushing of the content to their accounts.

166.   The addictive nature of Meta, Snap and TikTok's products and the complex and psychologically manipulative design of their algorithms is unknown to ordinary consumers, particularly minors.

167.   Defendants go to significant lengths to prevent transparency, including posing as a "free" social media platform, burying advertisements in personalized content, and making public statements about the safety of their products that simply are not true.

168.   Defendants also have developed unique product features designed to limit, and have in other ways limited, parents' ability to monitor and prevent problematic use by their children.

---

[23] https://www.documentcloud.org/documents/21600853-tier1_rank_exp_1019

169.    Defendants' addiction-driven algorithms adapt to the social media activity of individual users to promote *whatever* content will trigger a particular user's interest and maximize their screen time. That is, prior to the point when Meta, Snap and TikTok have addicted their users and are then able to influence user preferences, their algorithm designs do not distinguish, rank, discriminate, or prioritize between types of content. For example, if the algorithm can increase User One engagement with elephants and User Two engagement with moonbeams, then Defendants' algorithm design will promote elephant content to User One and moonbeam content to User Two. These types of algorithms are solely quantitative devices and make no qualitative distinctions between the nature and type of content they promote to users.

170.    Meta's, Snap's and TikTok's algorithms are not simply tools meant to facilitate the communication and content of others but are content in and of themselves. These algorithms do not function like traditional search engines that select content for users based on user inputs; they direct minor users to content based on far more than the individual users' viewing history. The algorithms make recommendations not simply based on minor users' voluntary actions but also the demographic information and social media activity of the users' friends, followers, and cohorts—even other users who simply live nearby. The user data that these algorithms use to select content therefore encompasses far more information than voluntarily furnished by a particular user and include private information about the user that Meta, Snap and TikTok discover through undisclosed surveillance of user behavior both online and offline.

**H.    Minor Users' Incomplete Brain Development Renders Them Particularly Susceptible to Manipulative Algorithms with Diminished Capacity to Eschew Self-Destructive Behaviors and Less Resiliency to Overcome Negative Social Media Influences**

171.    The human brain is still developing during adolescence in ways consistent with adolescents' demonstrated psychosocial immaturity. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotional regulation, and impulse control.

172.    The frontal lobes—and in particular the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision-making. These regions of the brain are central to the process of planning and decision-making, including

the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature.

173.   During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood.

174.   In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses and emotions and for mature, considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

175.   The recommendation technologies in Meta, Snap and TikTok's social media products are designed to exploit minor users' diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency caused by users' incomplete brain development. Defendants know, or in the exercise of reasonable care should know, that because their minor users' frontal lobes are not fully developed, they experience enhanced dopamine responses to stimuli on Defendants' social media platforms and are therefore much more likely to become addicted to Defendants' products; exercise poor judgment in their social media activity; and act impulsively in response to negative social media encounters. Defendants also know, or in the exercise of reasonable care should know, that minor users of their social media products are much more likely to sustain serious physical and psychological harm through their social media use than adult users. Nevertheless, Defendants knowingly designed their social media products to

be addictive to minor users and failed to include in their product design any safeguards to account for and ameliorate the psychosocial immaturity of their minor users.

I.      **Defendants Misrepresent the Addictive Design of Their Social Media Products**

176.    Meta, Snap and TikTok do not warn users of the addictive design of their product. On the contrary, Meta, Snap and TikTok actively conceal the dangerous and addictive nature of their products, lulling users and parents into a false sense of security. This includes consistently playing down their products' negative effects on teens in public statements and advertising, making false or materially misleading statements concerning product safety, and refusing to make their research public or available to academics or lawmakers who have asked for it.

177.    Meta, Snap and TikTok have repeatedly represented to the public and governments around the world that their products are safe and not addictive. To name only a few examples,

      a.    In or around July 2018, Meta told BBC News that "at no stage does wanting something to be addictive factor into" its product design process.

      b.    Meta told U.S. Senators (i) in November 2020 that "We certainly do not want our products to be addictive"[24] (ii) in March 2021 that Instagram is not addictive and that it does not cause harm to children and teens[25] (iii) in September 2021, that Instagram is not addictive[26] and repeatedly denied the existence of causal research regarding harms to teens from Instagram use and testified that Meta's overreaching goal is child safety: "We work tirelessly to put in place the right policies, products, and precautions so [young users] have a safe and positive experience." [27] (iv) in December

---

[24] https://www.tampafp.com/great-news-facebook-is-not-designed-to-be-addictive-according-to-zuckerberg/

[25] https://www.congress.gov/117/meeting/house/111407/documents/HHRG-117-IF16-Transcript-20210325.pdf, at p. 67, 107, 175.

[26] https://www.rev.com/blog/transcripts/facebook-head-of-safety-testimony-on-mental-health-effects-full-senate-hearing-transcript ("Sept. 30, 2021, Senate Hearing Transcript"), at 2:06:35; *see also id*. at 02:07:44 and 02:07:59 (Ms. Davis also denied that Meta's business model includes getting users engaged for longer amounts of time).

[27] *Id*. at 24:58, 01:47:29, 1:48:07, 1:48:20, 2:10:47, 33:46, and 40:41.

2021, that Instagram is not addictive[28] and that its overarching goal is child safety. [29] Yet at all times relevant, Meta managers and designers were attending an annual conference (beginning in 2014 and held in Silicon Valley) called the Habit Summit, the primary purpose of which was to learn how to make products more habit-forming.

c.   Snapchat's terms of service claim Snap is "deeply committed to the safety and well being of [its] community" and it's products "apply safety by design principles."

d.   TikTok's Vice President and Head of Public Policy for the Americas, Michael Beckerman, testified under oath to Congress that TikTok creates age-appropriate experiences, and does not allow people under 16 to send direct messages on its platform. In fact, TikTok takes no reasonable precautions when it comes to children under 16, first and foremost, because it does not actually verify user age or identity. And several children have died after being exposed to various TikTok Challenges as direct result of TikTok's algorithm recommending and/or promoting such content. TikTok also knows of underage users and allows them to post videos, then fails to take those videos down promptly upon discovery that the user is underage. On information and belief, TikTok managers and designers participated in the Habit Summit as well.

178.   During the relevant time period, Meta and TikTok stated in public comments that their products are not addictive and were not designed to be addictive. Defendants knew or should have known that those statements were untrue.

179.   During the relevant time period, Meta, Snap and TikTok advertised via commercials and/or third parties that their products were fun and safe to use, and that Defendants

---

[28] https://www.commerce.senate.gov/2021/12/protecting-kids-online-instagram-and-reforms-for-young-users, recording of December 8, 2021 Senate Hearing.

[29] https://www.npr.org/2021/12/08/1062576576/instagrams-ceo-adam-mosseri-hears-senators-brush-aside-his-promises-to-self-poli

employed their technologies to ensure safe and age-appropriate experiences. Defendants knew or should have known that those statements were untrue.

180.    Neither Meta, Snap or TikTok warned users or their parents of the addictive and mentally harmful effects that the use of their products was known to cause amongst minor users. On the contrary, Defendants have gone to significant lengths to conceal and/or avoid disclosure as to the true nature of their products.

**J.      Plaintiffs Expressly Disclaim Any and All Claims Seeking to Hold Defendants Liable as the Publisher or Speaker of Any Content Provided, Posted, or Created by Third Parties**

181.    Plaintiffs seeks to hold Defendants accountable for their own alleged acts and omissions. Plaintiffs' claims arise from Defendants' status as designers and marketers of dangerously defective social media product, as well as Defendants' own statements and actions, not as the speaker or publisher of third-party content.

182.    Meta, Snap and TikTok designed and have progressively modified their products to promote problematic and excessive use that they know is indicative of addictive and self-destructive use. Defendants' product features are designed to be and are addictive and harmful in themselves, without regard to any content that may exist on Defendants' platforms. For example, Defendants "like" and "follow" features are content neutral and have nothing to do with the content or material a user sees. Defendants also have developed and modified product features like the continuous loop feed and push notifications, to incentivize users to stay on the product as long as possible and to convince users to log back on. Defendants even calculate the most effective time to send such notifications, which in the case of young users often means in the middle of the night and/or during school hours. Essentially, the times they are least likely to have access to Defendants' social media products, which also—as Defendants know—are the times that their health and well-being necessitate them not being on Defendants' social media product. Meta, Snap and TikTok's products are designed to and do addict users on a content neutral basis.

183.    The structure of these social media products and the technologies Defendants' design and utilize are, standing alone, harmful to users and irrespective of content. For example, a

primary purpose of Defendants' algorithm designs is to determine individual user preferences first so that Defendants can then influence user behavior and choices second—which is particularly dangerous in the case of teens. On a content neutral basis, the manipulation and control these Defendants knowingly wield over their users daily is profoundly dangerous.

184.    Defendants have designed other product features for the purpose of encouraging and assisting children in evasion of parental oversight, protection, and consent, which features are wholly unnecessary to the operation of Defendants' products.

185.    Defendants affirmatively promote, encourage, and/or otherwise contribute to the development of harmful content. In an October 2021 Senate Hearing it was revealed that Meta documents provided by a whistleblower demonstrate that Defendants promote, encourage, and/or otherwise contribute to the development of harmful content. The Senate hearing revealed that,

a.    Defendants approve of ads that contain harmful content, for example, "designed to encourage and promote anorexia" and encourage children to abuse prescription or illegal drugs, which ads Defendants then target specifically at children in exchange for payment.

b.    Defendants utilize private information of their minor users to "precisely target [them] with content and recommendations, assessing what will provoke a reaction," including encouragement of "destructive and dangerous behaviors." Defendants specifically select and push this harmful content, for which they are paid, to increase user engagement. "That's how [defendants] can push teens into darker and darker places." (Senator Blumenthal, October 5, 2022).

c.    Defendants "know[] that [their] amplification algorithms, things like engagement-based ranking … can lead children from very innocuous topics like healthy recipes … all the way from just something innocent like healthy recipes to anorexia promoting content over a very short period of time." Defendants have knowledge that their products and the content they are encouraging and helping to create is harmful to young users and choose

"profits over safety."

186.    Defendants' technologies identify minor users by age and gender and, on information and belief, race, ethnicity, sexual orientation, and economic status and direct specific content to specific users based upon these factors, and numerous, undisclosed others. User data obtained through Defendants' algorithms, particularly age and gender, affirmatively directs predatory adults to vulnerable minor users. In this way, the Defendant's algorithms promote responses from predatory adult users that violate state and federal law. Because Defendants' social media products themselves generate the options for selecting a user based on predatory criteria, they materially contributed to the unlawfulness of the posted content described herein.

187.    Defendants are responsible for these harms. These harms are caused by Defendants' designs and design-decisions, and not any single incident of third-party content.

188.    While it may be that a third party creates a particular piece of harmful content, the teens and children harmed by Defendants' social media products are not being harmed by a single piece of harmful content. They are being harmed by Defendants' products, programming, and decisions to expose teens and children to harmful product features and to show teens and children a constant barrage of harmful content to obtain more advertising revenue and increase engagement.

189.    E.R. and children like her do not open social media accounts in the hopes of become addicted. Nonetheless, such children *do* become addicted, leading them to engage in foreseeable addict behaviors, such as lying to their parents, hiding their use of Defendants' products, losing control, becoming irritable and depressed when access is denied, and hyper-vigilance to avoid detection. These and other behaviors can and do result in serious harm to Defendants' minor users and resulted in serious harm to Plaintiffs.

190.    E.R. and children like her do not start using social media in the hopes of being exposed to product features that cause harm to them. Yet the use of Instagram and TikTok involves harmful forms of social comparison and inevitably pushes such children towards harmful "rabbit holes," causing anxiety, depression, eating disorders, and self-harm—harms at least some of these Defendants acknowledge in internal documents. Defendants' products caused these harms to E.R.

191.    The harms at issue in this case do not relate to or arise from third party content, but

rather, Defendants' product features and designs, including algorithms and other technology that (a) addicts minor users to their products; (b) amplify and promote harmful social comparison through product features; (c) affirmatively select and promote harmful content to vulnerable users based on its individualized demographic data and social media activity; and (d) put minor users in contact with dangerous adult predators and otherwise expose to them to seemingly unstoppable unwanted interactions from persons not on their friend list or equivalent. Indeed, the foregoing are merely examples of the kinds of harms at issue in this case.

192.    None of Plaintiffs' claims rely on treating Defendants as the publisher or speaker of any third party's words or content. Plaintiffs' claims seek to hold these Defendants accountable for their own allegedly wrongful acts and omissions, not for the speech of others or for any good faith attempts on the part of these Defendants to restrict access objectionable content.

193.    None of Plaintiffs' Claims for Relief set forth herein treat Defendants as a speaker or publisher of content posted by third parties. Rather, Plaintiffs seek to hold Defendants liable for their own speech and their own silence in failing to warn of foreseeable dangers arising from anticipate use of their products. Defendants could manifestly fulfill their legal duty to design a reasonably safe social product and furnish adequate warnings of foreseeable dangers arising out of the use of their products without altering, deleting, or modifying the content of a single third-party post or communication. Some examples include,

194.    Not using their addictive and inherently dangerous algorithm and similar technologies in connection with any account held by a user under the age of 18.

195.    Not permitting any targeted advertisements to any user under the age of 18.

196.    Prioritizing internally their removal of harmful content (content their systems are promoting and amplifying) over the risk of losing some user engagement.

197.    Requiring identification upon opening of a new account, requiring parental consent for users under the age of 18 (which TikTok currently claims to do but does not actually enforce in any way), and restricting users under the age of 18 to a single account. This is something teens have even asked these companies to do *for their safety.*

198.    Requiring verification of email and phone number when a user opens a new

account. Not requiring verification allows underage users to access these social media products and does not stop bad actors.

199.    Immediate suspension of accounts where Defendants have reason to know that the user is under the age of 13, including when the user declares that they are under the age of 13 in their bio or comments or chats and/or messages with any third party and where Defendants can determine an "estimated" age of under 13 based on other information they collect and/or have in their possession (including, for example, posted videos that clearly feature children under 13); and not allowing the account to resume until the user provides proof of age and identity and/or parental consent.

200.    Suspension of accounts and, in some cases, user bans, where Defendants have reason to know that the user is over the age of 18, but where they are providing information to suggest that they are minors and/or are representing themselves as minors to other users; and not allowing the account to resume until the user provides proof of age and identity.

201.    Removing social comparison features and/or hiding those features to reduce their harmful impact on teen users.

202.    Instituting advertising safeguards to ensure that Defendants are not profiting directly from or otherwise pushing or endorsing harmful advertising content and removing advertising targeting tools so that advertisers cannot harm vulnerable user groups by aiming harmful advertisements at them.

203.    Requiring that all teen user accounts be set to private and not allowing any user under the age of 18 to change user settings to public.

204.    Removing all friend and group and content recommendation systems that involve teen users in any way (so, not recommending to teen users, but also, not recommending teen users to adults) and not permitting direct messaging or other forms of direct communication with any user under the age of 18 not already on the other user's friend list.

205.    These are just some examples, all of which could be accomplished easily and/or at commercially reasonable cost. Defendants know that they can make these change and, in many cases, have discussed these or similar changes internally. However, they have not instituted these

types of safety features because they know that doing so would impact their astronomical revenue.

## VI.   PLAINTIFF-SPECIFIC ALLEGATIONS

206.    E.R. was born in January 2005 in the State of Texas.



207.    She was a happy and outgoing child, who did well at school, and enjoyed spending time with her family and friends and playing soccer.

208.    E.R. got her first cell phone when she was 12 and in the 6th grade. She downloaded the Snapchat application so she could communicate with her friends. She also opened Facebook and Instagram accounts. Even though all three products claim they are not for users under the age of 13, E.R. was able to open the accounts because none of the products meaningfully verified her age.

209.    E.R.'s use of and developing addiction to Snapchat, Facebook, and Instagram

coincided with a steady and severe decline in her mental health.

210.    That summer—before E.R. started 7th grade—she began to compare her appearance to people she was seeing on Instagram. E.R. would print pictures of thin models she saw on Instagram and would tape them to high calorie foods in the pantry—to remind her that eating those foods would prevent her from losing weight.

211.    This was not content E.R. sought out, searched for, or even wanted – but rather, content Defendants identified and inundated E.R. with based on Defendants' decision to program its recommendation technology products (algorithms) to push user engagement over user safety. For years, Defendants have had actual knowledge of the harms their decisions and product designs are causing teen users, like E.R., and made calculated decisions to stay the course regardless.

212.    In 7th grade, E.R.'s social media use continued. The more E.R. became dependent on Defendants' products, the harder it became for her to put them down, to the point where she began having difficulty sleeping at night. E.R. would be on her phone immediately after school, during meals and late at night, and she began resenting her parents for not letting her use social media all the time. Moreover, Defendants continued identifying and targeting E.R. with content they knew or should have known to be harmful to her, and users like her. E.R. received and thus viewed hundreds if not thousands of images of very thin people and restrictive dieting and extreme exercise content daily.

213.    Defendant Meta has determined and internally acknowledged the fact that roughly ¼ of the content it targets to the average Instagram user is comprised of health and beauty content (which Meta also has identified as the most harmful category when it comes to harmful social comparison, anxiety and depression among teens, and similar harms); whereas, Meta also has determined and internally acknowledged that the ratio is 1/3 in the case of teen girls. That is, Meta has programmed its products in such a way that they are targeting and disproportionately harming teen girls *because* of their age and gender. This is referred to as algorithmic discrimination and/or algorithmic bias, and it is a defect known to each of these Defendants. Meta employees also have advised Meta that changings its programming even a little, *i.e.* to reduce the identification and

direction of this content by just a fraction, would significantly reduce the associated harms to users.

214.   Because of the way Defendants targeted her, E.R.  became focused on losing weight. E.R. liked to watch videos of people eating crunchy food because, she said, watching other people eat made her less hungry. As she lost weight, E.R. joined a competitive cheerleading team.



215.   That same year, E.R. became depressed and withdrawn. Unbeknownst to her mother, T.R., E.R. had started engaging in self-harm – which content Defendants also had been identifying and pushing to her Explore, Feed, and similar product pages. Once when T.R. picked her child up from school, a teacher asked her to meet with E.R., the principal of the school, and the school nurse. The principal told E.R. and her mother that E.R.'s friends had reported she was engaging in dangerous behavior and asked her to roll up her sleeve. E.R. refused. She only agreed to show her arm when the principal threatened to call the police. When revealed, her arm was

covered with self-inflicted cuts. E.R. said she cut herself to obtain a sense of control and to punish herself for eating and her body shape. T.R. took her daughter to the hospital and arranged for her to see a counselor.

216.   In Eighth grade, E.R.'s excessive social media use continued, and she became increasingly isolated from her family. Nor could T.R. exercise her parental rights to limit or restrict E.R.'s access to Defendants products, because of the degree of dependency E.R. had on those products as well as the fact that Defendants would not stop providing E.R. with access no matter what T.R. tried. When T.R. tried to restrict access, E.R. had extreme reactions, which reactions were foreseeable to Defendants given the degree of engineered addiction built into their social media products. Likewise, removing access entirely at home created the risk of self-harm and dangerous behavior, and in a circumstance where E.R. could obtain such access through any device and Wi-Fi, with or without her mother's consent.

217.   At some point, E.R. then downloaded the TikTok application. Like Meta and Snap, TikTok programs its technologies to addict and then escalate with child and teen users, which is precisely what it began doing with E.R.

218.   TikTok began identifying and sending incredibly harmful disordered eating and weight loss content to minor E.R., exacerbating the harms caused by Meta and Snap.

219.   E.R. began skipping breakfast and continued losing weight. She sometimes became ill at cheerleading practice because she hadn't eaten. The summer after 8th grade, E.R. began to restrict her food intake more severely. She stopped eating dinner, and when her mother forced her to eat, she ate as little as possible and would exercise intensely to burn the calories. She cried every day and would self-harm to control her emotions.

220.   This pattern continued in the 9th grade. T.R. noticed that E.R. would bring her uneaten lunch home from school every day. E.R. claimed that she would swap with friends for lunch. Her social media use continued, and she watched "way too much" content about food and weight. She watched "many" mukbangs, Korean social media videos that show a person eating.[30]

---

[30] A few American content creators make similar videos.

1   Watching the videos of other people eating helped control her own hunger pangs.

2   221.   In December 2019, E.R. first attempted suicide by drowning herself. She was angry

3   at herself for eating soup and pasta. She felt worthless and believed nothing could change. This

4   attempt went undiscovered by her parents.



21   222.   By January of 2020, T.R. became increasingly concerned about E.R.'s weight loss.

22   One evening she asked E.R. to get some dinner from the pantry. E.R. looked at the food in the

23   pantry and told her mother she could not eat any of it. T.R. took E.R. to the emergency room that

24   night. She was seen (virtually) by a psychiatrist who diagnosed E.R. with anorexia, suicidal

25   ideation, and anxiety. She was admitted to the hospital's psychiatric ward.

26   223.   After several days, E.R. was discharged from the psychiatric ward and began

27   treatment at the Eating Recovery Center ("ERC"), a partial hospitalization program in which E.R.

28   was in treatment twelve hours a day, 7 days a week while sleeping at home. After several months,

she was placed in an intensive outpatient program at the ERC, where she was treated for 4 hours per day.

224.    E.R.'s social media use continued, which prevented her from getting better. This is one of the greatest harms Defendants have caused to the American public and medical and insurance systems. Specifically, millions of families and doctors have been trying to help children and teens through unknown traumas and injuries and have been unable to provide the treatment and help needed because of Defendants. Defendants' refusal and failure to disclose what they knew and when they knew it regarding "problematic use" of their products, the targeting of children with harmful advertisements and content, and the impact of such defects on children and teens, has kept families and practitioners in the dark and without critical information; information they needed to help these children and teens. Defendants knew they were causing these harms and made deliberate cost-benefit decisions to stay the course in the interest of their own profits and growth

225.    In March of 2020, E.R. texted a friend that she was suicidal. The friend called T.R., who again took E.R. to the hospital, where she was admitted until being transferred to another partial hospitalization program, where she was treated for approximately one month. This treatment program focused on the depression and suicidal ideation—and E.R. returned worse than ever.

226.    In April 2020, E.R. contacted a suicide hotline from her home. Police were dispatched to her home, and she was hospitalized yet again.

227.    In early August 2020, E.R. was admitted to Avalon Hills, an inpatient eating disorder clinic in Utah. Her treatment at Avalon Hills identified that use of social media played a role in her eating disorder and self-harm. She noted "comparison: this issue can lead to all of the behaviors on top of my iceberg it was and is a big thing in my [eating disorder]." E.R. wrote about "mostly [being] affected by posts on social media . . someone posts about cutting so I feel the need to cut too." Limiting exposure to social media use was one of E.R.'s treatment goals.

228.    E.R. remained at Avalon Hills for four months, until November 23, 2020. When she returned to Texas, T.R. sold her home so that they could move to an equine property and E.R. could spend time caring for the horses. E.R. returned to school but was feeling depressed and

isolated. She began self-harming again. By February of 2021, E.R. needed to be in treatment again; however, T.R. could not find an inpatient facility that had space to admit E.R. She was treated at Innovations, a facility that treated depression and suicidality, but not eating disorders. E.R. relates that eating disorder grew worse over this time. Finally, her mother located an inpatient bed for E.R. at Avalon Hills again. E.R. stayed at Avalon Hills for 76 days this time, from April to June 2021. She was discharged against medical advice due to exhaustion of her insurance coverage.

229.    Defendants' apps and recommendation technologies identified and directed exceedingly and unacceptably harmful content to E.R., exploiting her vulnerabilities due to age and gender. This encouraged her to engage in harmful food-related behaviors. Defendants' harmful design and operation of their social media products directly caused and resulted in E.R.'s eating disorder and mental health decline.

230.    Defendants' apps and recommendation technologies identified and connected E.R. with complete strangers, persons she would not have met but for Defendants' user and group recommendation products, as well as public profile settings and direct message settings as applied to minor user accounts. At least some of these strangers exploited, bullied, and/or abused E.R.

231.    Defendants consider pre-teens and teens like E.R. to be their most valuable demographic and, for that reason, they are willing to do whatever they must to engage and addict them – even if that means targeting them with harmful content and exposing them to complete strangers. On information and belief, Defendants are aware of the harm their products are causing, could make changes at nominal time and expense, and have refused to make such changes to protect their own corporate revenue.

232.    Plaintiffs' lives have become a day-to-day push to help E.R. get and stay healthy.

**VII.    E.R. is now a senior in high school. She attends Texas Connections Academy, an online school. She continues to struggle with binge eating, self-harm and suicidal ideation. She remains in treatment. PLAINTIFFS' CLAIMS**

**COUNT I - STRICT PRODUCT LIABILITY (Design Defect)**

233.    Plaintiffs reallege each and every allegation contained in paragraphs 1 through 232 as if fully stated herein.

234.     Under Restatement (Second) of Torts § 402(a) and California law, one who sells any product in a defective condition unreasonably dangerous to the user is subject to liability for physical harm thereby caused to the user if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition which it was sold.

235.     Defendants' products are defective because the foreseeable risks of harm posed by the product's design could have been reduced or avoided by the adoption of a reasonable alternative design by Defendants and the omission of the alternative design renders the product not reasonably safe. These defective conditions rendered these products unreasonably dangerous to persons or property and existed at the time the product left Defendants' control, reached the user or consumer without substantial change in the condition and its defective condition was a cause of Plaintiffs' injury.

236.     Defendants designed, manufactured, marketed, and sold social media products that were unreasonably dangerous because they were designed to be addictive to the minor users to whom Defendants actively marketed and because the foreseeable use of Defendants' products causes mental and physical harm to minor users.

237.     Defendants' products were unreasonably dangerous because they contained numerous design characteristics that are not necessary for the utility provided to the user but are unreasonably dangerous and implemented by Defendants solely to increase the profits they derived from each additional user and the length of time they could keep each user dependent on their product.

**A.       Inadequate Safeguards From Harmful and Exploitative Content**

238.     TikTok, Snapchat and Meta's social networking products are defectively designed.

239.     As designed these platforms' recommendation and other product features are not reasonably safe because they affirmatively direct minor users to harmful and exploitative content while failing to deploy feasible safeguards to protect vulnerable teens from such harmful exposures. It is feasible to design an algorithm and technologies that substantially distinguish between harmful and innocuous content and protect minor users from being exposed to harmful

content without altering, modifying, or deleting any third-party content posted on Defendants' social media products. The cost of designing these products to incorporate this safeguard would be negligible while benefit would be high in terms of reducing the quantum of mental and physical harm sustained by minor users and their families.

240.    As designed, recommendations and other product features of Meta's, Snap's and TikTok's products are not reasonably safe because they affirmatively direct and recommend minor users to harmful groups and other users, while failing to deploy feasible safeguards to protect vulnerable teens from such harmful exposures. It is feasible to design an algorithm and technologies that do not make harmful connection recommendations to minor users, or any connection recommendations at all; it is feasible to design an algorithm and technologies that do not recommend harmful groups to minor users, or any group recommendations at all; and it is feasible to restrict access to minor users by strangers and adult users via direct messaging, to restrict and limit such access to users already on a minor user's "friend" list, or to prevent such access altogether. Defendants know that these product features cause a significant number of harms to their minor users, such as sexual exploitation, bullying, and encouragement of self-harm and suicide.

241.    Defendants also engage in conduct, outside of the algorithms and related technologies themselves, that is designed to promote harmful and exploitative content as a means of increasing their revenue from advertisements. This includes but is not limited to efforts to encourage advertisers to design ads that appeal to minors, including teens like E.R.; and product design features intended to attract and engage minor users to these virtual spaces where harmful ad content is then pushed to those users in a manner intended to increase user engagement, thereby increasing revenue to Defendants at the direct cost of user wellbeing.

242.    Reasonable users (and their parents) would not expect that Defendants' products would knowingly expose them to such harmful content and/or that Defendants' products would direct them to harmful content at all, much less in the manipulative and coercive manner that they do. Defendants have and continue to knowingly use their algorithms and other technologies on users in a manner designed to affirmatively change their behavior, which methods are particularly

effective on (and harmful to) Defendants' youngest users.

**B.     Failure to Verify Minor Users' Age and Identity**

243.    TikTok, Snap and Meta's social media platforms are defectively designed.

244.    As designed, Defendants' products are not reasonably safe because they do not provide for adequate age verification by requiring users to document and verify their age and identity.

245.    Adults frequently set up user accounts on Defendants' social media products disguising their identity and/or posing as minors to groom unsuspecting minors to exchange sexually explicit content and images, which frequently progresses to sexual exploitation and trafficking, and commercial sex acts.

246.    Minor users of social media and their parents do not reasonably expect that prurient adults set up fraudulent accounts on Defendants' social media products and pose as minors for malign purposes.

247.    Likewise, minor users whose parents have taken affirmative steps to keep them away from Defendants' products often open multiple accounts, such that Defendants know or have reason to know that the user is underage and/or does not have parental permission to use their product. Defendants already have the information and means they need to ascertain with reasonable certainty their users' actual age. Defendants utilize these tools to investigate, assess, and report on percentages and totals of underage users for internal assessment purposes. They then choose to simply do nothing about that information as it relates to the specific, underaged users themselves.

248.    Reasonably accurate age and identity verification is not only feasible but widely deployed by online retailers and internet service providers. Defendants not only can estimate the age of their users, but they do.

249.    The cost of incorporating age and identify verification into Defendants' products would be negligible, whereas the benefit of age and identity verification would be a substantial reduction in severe mental health harms, sexual exploitation, and abuse among minor users of Defendants' products.

**C.   Inadequate Parental Control and Monitoring**

250.   TikTok, Snap and Meta's social media platforms are defectively designed.

251.   Defendants have intentionally designed products to frustrate the exercise of parental responsibility by their minor users' parents. Parents have a right to monitor their children's social media activity to protect them from harm. Defendants have designed products that make it difficult, if not impossible, for parents to exercise parental responsibility.

252.   It is feasible to design a social media product that requires parental consent for users under the age of 18 and prohibits users under the age of 13.

253.   Defendants' products are also defective for lack of parental controls, permission, and monitoring capability available on many other devices and applications.

254.   Defendants' products are designed with specific product features intended to prevent and/or interfere with parents' reasonable and lawful exercise of parental control, permission, and monitoring capability available on many other devices and applications.

**D.   Intentional Direction of Minor Users to Harmful and Exploitative Content**

255.   TikTok, Snap and Meta's social media platforms are defectively designed.

256.   Default "recommendations" communicated to new teenage users, including E.R., purposefully steered her toward content Defendants knew to be harmful to children of her age and gender.

257.   Ad content pushed to new minor users, including E.R., because of their age and vulnerability, purposefully steer those users toward content Defendants know to be harmful to children of their age and gender. This defect is only worsened by the algorithmic discrimination that exists in Defendants' products, and operated to the detriment of E.R.

**E.   Inadequate Protection of Minors from Sexual Exploitation and Abuse**

258.   TikTok, Snap and Meta's social media platforms are defectively designed.

259.   Defendants' products are not reasonably safe because they do not protect minor users from sexually explicit content and images, report sex offenders to law enforcement, or allow users' parents to readily report abusive users to law enforcement.

260.   Parents do not expect their children will use Defendants' products to exchange

sexually explicit content and images and minor users do not expect that prurient adults pose as minors for malign purposes or that exchange of such content will be deleterious to their personal safety and emotional health.

261.    Minor users of Defendants' products lack the cognitive ability and life experience to identify online grooming behaviors by prurient adults and the psychosocial maturity to decline invitations to exchange salacious material.

262.    Defendants' products are unreasonably dangerous and defective as designed because they allow minor children to use "public" profiles, in many cases default "public" profiles, that can be mass-messaged by anonymous and semi-anonymous adult users for the purposes of sexual exploitation and grooming, including the sending of encrypted, disappearing messages and cash rewards through Defendants' integrated design features.

**F.    Design of Addictive Social Media Products**

263.    TikTok, Snap and Meta's social media platforms are defectively designed As designed, Defendants' social media products are addictive to minor users as follows: When minors use design features such as "likes" or "streaks" it causes their brains to release dopamine, which creates short term euphoria. However, as soon as dopamine is released, minor users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated and their euphoria is countered by dejection. In normal stimulatory environments, this dejection abates, and neutrality is restored. However, Defendants' algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria. As this pattern continues over a period of months and the neurological baseline to trigger minor users' dopamine responses increases, they continue to use the social media products at issue, not for enjoyment, but simply to feel normal. Once they stop using these products, minor users experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

264.    Addiction is not restricted to a substance abuse disorders. Rather, the working definition of addiction promulgated in the seminal article *Addictive behaviors: Etiology and Treatment* published by the American Psychological Association in its 1988 *Annual Review of*

*Psychology* defines addiction as,

> a repetitive habit pattern that increases the risk of disease and/or associate personal and social problems. Addictive behaviors are often experienced subjectively as 'loss of control' – the behavior contrives to occur despite volitional attempts to abstain or moderate use. These habit patterns are typically characterized by immediate gratification (short term reward), often coupled with delayed deleterious effects (long term costs). Attempts to change an addictive behavior (via treatment or self-initiation) are typically marked with high relapse rate.

265.   Addiction researchers agree that addiction involves six core components: (1) salience—the activity dominates thinking and behavior; (2) mood modification—the activity modifies/improves mood; (3) tolerance—increasing amounts of the activity are required to achieve previous effects; (4) withdrawal—the occurrence of unpleasant feelings when the activity is discontinued or suddenly reduced; (5) conflict—the activity causes conflicts in relationships, in work/education, and other activities; and (6) relapse—a tendency to revert to earlier patterns of the activity after abstinence or control.

266.   Social media addiction has emerged as a problem of global concern, with researchers all over the world conducting studies to evaluate how pervasive the problem is. Addictive social media use is manifested when a user (1) becomes preoccupied by social media (salience); (2) uses social media in order to reduce negative feelings (mood modification); (3) gradually uses social media more and more in to get the same pleasure from it (tolerance/craving); (4) suffers distress if prohibited from using social media (withdrawal); (5) sacrifices other obligations and/ or cases harm to other important life areas because of their social media use (conflict/functional impairment); and (6) seeks to curtail their use of social media without success (relapse/loss of control).

267.   The Bergen Facebook Addiction Scale (BFAS) was specifically developed by psychologists to assess subjects' social media use using the aforementioned addiction criteria, and is by far the most widely used measure of social media addiction. Originally designed for Facebook, BFAS has since been generalized to all social media. BFAS has been translated into dozens of languages, including Chinese, and is used by researchers throughout the world to measure social media addiction.

268.    BFAS asks subjects to consider their social media usage with respect to the six following statements and answer either (1) very rarely, (2) rarely, (3) sometimes, (4) often, or (5) very often,

    a.    You spend a lot of time thinking about social media or planning how to use it.

    b.    You feel an urge to use social media more and more.

    c.    You use social media in order to forget about personal problems.

    d.    You have tried to cut down on the use of social media without success.

    e.    You become restless or troubled if you are prohibited from using social media.

    f.    You use social media so much that it has had a negative impact on your job/studies.

Subjects who score a "4" or "5" on at least 4 of those statements are deemed to suffer from social media addiction.

269.    Addictive use of social media by minors is psychologically and neurologically analogous to addiction to internet gaming disorder as described in the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5), which is used by mental health professionals to diagnose mental disorders. Gaming addiction is a recognized mental health disorder by the World Health Organization and International Classification of Diseases and is functionally and psychologically equivalent to social media addition. The diagnostic symptoms of social media addiction among minors are the same as the symptoms of addictive gaming promulgated in DSM 5 and include:

    a.    Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when device is taken away or not possible (sadness, anxiety, irritability).

    b.    Tolerance, the need to spend more time using social media to satisfy the urge.

    c.    Inability to reduce social media usages, unsuccessful attempts to quit gaming.

    d.    Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

e.  Continuing to use social media despite problems.

f.  Deceiving family members or others about the amount of time spent on social media.

g.  The use of social media to relieve negative moods, such as guilt or hopelessness.

h.  and Jeopardized school or work performance or relationships due to social media usage.

270.  Defendants' advertising profits are directly tied to the quantity of their users' online time and engagement, and their algorithms and other product features are designed to maximize the time users spend using the product by directing them to content that is progressively more and more stimulative. Defendants enhance advertising revenue by maximizing users' time online through a product design that addicts them to the platform. However, reasonable minor users and their parents do not expect that online social media platforms are psychologically and neurologically addictive.

271.  It is feasible to make Defendants' products not addictive to minor users by turning off the algorithms, limiting the frequency and duration of access, and suspending service during sleeping hours. Designing software that limits the frequency and duration of minor users' screen use and suspends service during sleeping hours could be accomplished at negligible cost; whereas the benefit of minor users maintaining healthy sleep patterns would be a significant reduction in depression, attempted and completed suicide, and other forms self-harm among this vulnerable age cohort.

## G.  Inadequate Notification of Parents of Dangerous and Problematic Social Media Usage by Minor Users

272.  TikTok, Snap and Meta's social media platforms are defectively designed.

273.  Defendants' products are not reasonably safe as designed because they do not include any safeguards to notify users and their parents of usage that Defendants knows to be problematic and likely to cause negative mental health effects to users, including excessive passive use and use disruptive of normal sleep patterns. This design is defective and unreasonable.

274. It is reasonable for parents to expect that social media companies that actively promote their platforms to minors will undertake reasonable efforts to notify parents when their child's use becomes excessive or occurs during sleep time. It is feasible for Defendants to design a product that identifies a significant percentage of its minor users who are using the product more than three hours per day or using it during sleeping hours at negligible cost.

275. Defendants' products are not reasonably safe as designed because, despite numerous reported instances of child sexual solicitation and exploitation by adult users, Defendants have not undertaken reasonable design changes to protect underage users from this abuse, including notifying parents of underage users when they have been messaged or solicited by an adult user or when a user has sent inappropriate content to minor users.

276. Defendants' entire business is premised upon collecting and analyzing user data and it is feasible to use Defendants' data and algorithms and other technologies to identify and restrict improper sexual solicitation, exploitation, and abuse by adult users.

277. Moreover, it is reasonable for parents to expect that platforms such as those operated by defendants, which actively promote their products to minors, will undertake reasonable efforts to identify users suffering from mental injury, self-harm, or sexual abuse and implement technological safeguards to notify parents by text, email, or other reasonable means that their child is in danger.

278. As a proximate result of these dangerous and defective design attributes of Defendants' products, E.R. suffered severe mental harm. Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of these defective design in Defendants' products until 2022.

279. As a result of these dangerous and defective design attributes of Defendants' product, Plaintiffs T.R. has suffered emotional distress, physical harms, and pecuniary hardship due to her child's mental harm resulting from her social media addiction.

280. Defendants are further liable to Plaintiffs for punitive damages based upon the willful and wanton design of its product that was intentionally marketed and sold to underage users, whom they knew would be seriously harmed through their use of Defendants' products.

**COUNT II – STRICT PRODUCT LIABILITY (Failure to Warn)**

281.     Plaintiffs reallege each and every allegation contained in paragraphs 1 through 280 as if fully stated herein.

282.     Defendants' products are defective because of inadequate instructions or warnings because the foreseeable risks of harm posed by these products could have been reduced or avoided by the provision of reasonable instructions or warnings by the manufacturer and the omission of the instructions or warnings renders the product not reasonably safe. This defective condition rendered the products unreasonably dangerous to persons or property, existed at the time the products left Defendants' control, reached the user or consumer without substantial change in the condition in which they were sold, and were a cause of Plaintiffs' injuries.

283.     Defendants' products are unreasonably dangerous and defective because they contain no warning to users or parents regarding the addictive design and effects of these products.

284.     Defendants' social media product rely on highly complex and proprietary algorithms and similar technologies that are both undisclosed and unfathomable to ordinary consumers, who do not expect that social media platforms are physically and/or psychologically addictive.

285.     The magnitude of harm from addiction to Defendants' product is horrific, ranging from simple diversion from academic, athletic, and face-to-face socialization to sleep loss, severe depression, anxiety, self-harm, and suicide.

286.     The harms resulting from minors' addictive use of social media platforms have been not only well-documented in the professional and scientific literature, but Defendants had actual knowledge of such harms.

287.     Defendants' products are unreasonably dangerous because they lack any warnings that foreseeable product use can disrupt healthy sleep patterns or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours. Excessive screen time is harmful to adolescents' mental health and sleep patterns and emotional well-being. Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media

use outside their parents' presence.

288.    It is feasible for Defendants' products to report the frequency and duration of their minor users' screen time to their parents without disclosing the content of communications at negligible cost, whereas parents' ability to track the frequency, time and duration of their minor child's social media use are better situated to identify and address problems arising from such use and to better exercise their rights and responsibilities as parents.

289.    Defendants knew about these harms, knew that users and parents would not be able to safely use their products without warnings, and failed to provide warnings that were adequate to make the product reasonably safe during ordinary and foreseeable use by children.

290.    As a result of Defendants' failure to warn, E.R. suffered severe mental harm, leading to physical injury from her use of TikTok, Snap and Meta's social media products.

291.    As a result of Defendants' failure to warn, Plaintiff T.R. has suffered emotional distress and pecuniary hardship due to her child's mental harm resulting from social media addiction.

292.    Defendants are further liable to Plaintiffs for punitive damages based upon their willful and wanton failure to warn of known dangers of their products that were intentionally marketed and sold to teenage users, whom they knew would be seriously harmed through their use of Instagram and TikTok.

### COUNT III – NEGLIGENCE

293.    Plaintiffs reallege each and every allegation contained in paragraphs 1 through 292 as if fully stated herein.

294.    At all relevant times, Defendants had a duty to exercise reasonable care and caution for the safety of individuals using their products, such E.R.

295.    Defendants owe a heightened duty of care to minor users of their social media products because adolescents' brains are not fully developed, which results in a diminished capacity to make good decisions regarding their social media usages, eschew self-destructive behaviors, and overcome emotional and psychological harm from negative and destructive social media encounters.

296.    As product manufacturers marketing and selling products to consumers, Defendants owed a duty to exercise ordinary care in the manufacture, marketing, and sale of their products, including a duty to warn minor users and their parents of hazards that Defendants knew to be present, but not obvious, to underage users and their parents.

297.    As business owners, Defendants owe their users who visit their social media platforms and from whom they derive billions of dollars per year in advertising revenue a duty of ordinary care substantially similar to that owed by physical business owners to its business invitees.

298.    Defendants were negligent, grossly negligent, reckless and/or careless in that they failed to exercise ordinary care and caution for the safety of underage users, like E.R., using their social media products.

299.    Defendants were negligent in failing to conduct adequate testing and failing to allow independent academic researchers to adequately study the effects of their products and levels of problematic use amongst teenage users. Defendants know that their products are harmful, cause extensive mental harm, and that minor users are engaging in problematic and addictive use that their parents are helpless to monitor and prevent.

300.    Defendants are negligent in failing to provide adequate warnings about the dangers associated with the use of social media products and in failing to advise users and their parents about how and when to safely use their social media platforms and features.

301.    Defendants are negligent in failing to fully assess, investigate, and restrict the use of their social media products by adults to sexually solicit, abuse, manipulate, and exploit minor users of their social media products.

302.    Defendants are negligent in failing to provide users and parents the tools to ensure their social media products are used in a limited and safe manner by underage users.

303.    As a result of Defendants' negligence, E.R. suffered severe mental harm from her use of Instagram, Facebook, Snapchat and TikTok.

304.    As a result of Defendants' negligence, Plaintiff T.R. has suffered emotional distress, physical harm, and pecuniary hardship due to her child's mental harms resulting from

social media addictions.

305.    Defendants are further liable to Plaintiffs for punitive damages based upon its willful and wanton conduct toward underage users, including E.R., whom they knew would be seriously harmed through the use of their social media products.

### COUNT IV - VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW
### (Cal. Bus. & Prof. Code §§ 17200, *et seq.*)

306.    Plaintiff realleges each and every allegation contained in paragraphs 1 through 305 as if fully stated herein.

307.    Defendants Meta, Snap and TikTok are corporations, and thus each is a "person," as defined by California Business & Professions Code § 17201.

308.    The UCL prohibits all conduct that is unlawful, unfair, or fraudulent.

309.    Defendant's conduct is unlawful as set forth in Counts I–III, above.

310.    Defendant's conduct is unlawful also because it has knowledge of users under the age of 13 on its platform and, in fact, actively target, market to, and encourage use of their social media product by minors under the age of 13.

311.    Defendant's conduct is unlawful also because it has knowledge of users under the age of 18 on its platform who lack parental consent to use their products and, in fact, actively target, market to, and encourage use of their social media products by minors under the age of 18 who lack parental consent to use their products.

312.    Defendant engaged in fraudulent and deceptive business practices in violation of the UCL by promoting products to underage users, including E.R., while concealing critical information regarding the addictive nature and risk of harm these products pose. Defendants knew and should have known that their statements and omissions regarding the addictive and harmful nature of their products were misleading and therefore likely to deceive the members of the public who use Defendants' products and who permit their underage children to use Defendants' products. Had T.R. known of the dangerous nature of Defendants' products, she would have taken early and aggressive steps to stop or limit her child's use of Defendants' products.

313.    Defendant's practices are unfair and violate the UCL because they offend

established public policy, and because the harm these practices cause to consumers greatly outweighs any benefits associated with them. Additionally, Defendants have designed their products to lock-in users, especially children and teens. They know that minors want to use their products and that the more minors invest in Defendants' products the harder it is for them to switch. It is hard to switch because of network effects and sunk costs, and Defendants design their products explicitly around these designs for the purpose of locking-in users. As of now, each of these defendants have locked-in the majority (possibly over 80%) of all U.S. teens aged 13 to 17 and with access to the internet. Both Defendants are actively working to hit 100%.

314.    Defendants' conduct has resulted in substantial injuries that Plaintiffs could not reasonably have avoided because of Defendants' deceptive conduct. This substantial harm is not outweighed by any countervailing benefits to consumers or competition.

315.    As a direct and proximate result of the foregoing acts and practices, Defendants have received, or will receive, income, profits, and other benefits, which they would not have received if they had not engaged in the violations of the UCL described herein. As a direct and proximate result of the foregoing acts and practices, Defendants have also obtained unfair advantages over similar businesses that have not engaged in such practices.

316.    As a result of Defendants' UCL violations, Plaintiffs have suffered injury in fact and lost money as set forth herein.

317.    Accordingly, Plaintiffs seek injunctive and equitable relief to halt and remedy Defendant's unlawful, fraudulent, and unfair conduct.

**COUNT V – UNJUST ENRICHMENT**

318.    Plaintiff realleges each and every allegation contained in paragraphs 1 through 317 as if fully stated herein.

319.    As a result of Defendants' conduct detailed herein, Defendants received a benefit. Because Defendants' advertising profits are directly tied to the number of user accounts and the amount of time those users spend on Instagram, Defendants benefited directly from E.R.'s problematic use of their products, both from the amount of time she spent on Defendants' products and from her creation of multiple accounts.

320.    It would be unjust and inequitable for Defendants to retain the ill-gotten benefits at Plaintiffs' expense, in light of Defendants' acts and omissions described herein.

321.    Accordingly, Plaintiffs seek damages in an amount to be proven at trial.

## COUNT VI – INVASION OF PRIVACY

### (California Constitutional Right to Privacy, Cal. Const. Art. 1, § 1)

322.    Plaintiffs reallege each and every allegation contained in paragraphs 1 through 321 as if fully stated herein.

323.    Defendant intentionally intruded upon Plaintiffs' solitude, seclusion, or private affairs by knowingly designing its product with features that were intended to, and did, frustrate parents' ability to monitor and control their children's social media usage.

324.    These intrusions are highly offensive to a reasonable person, particularly given Defendant's interference with the fundamental right of parenting and its exploitation of children's special vulnerabilities for commercial gain.

325.    Plaintiffs were harmed by Defendant's invasion of privacy, as detailed herein.

326.    Plaintiffs therefore seek compensatory and punitive damages in amounts to be determined at trial, as well as injunctive relief requiring Defendant to cease the harmful practices described throughout this complaint.

## COUNT VII – SEX DISCRIMINATION

### (Unruh Civil Rights Act, Cal. Civil Code §§ 51, 52(a))

327.    Plaintiff realleges each and every allegation contained in paragraphs 1 through 326 as if fully stated herein.

328.    The California Unruh Civil Rights Act provides that "All persons within the jurisdiction of this state are free and equal, and no matter what their sex . . . are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Cal. Civ. Code § 51(b). For purposes of the Unruh Act, the word "Sex" "includes, but is not limited to, a person's gender." *Id*. at § 51(e)(5).

329.    The Unruh Act applies to online business establishments.

330.    As described above, Defendants have intentionally, knowingly, and purposefully

engaged in discriminatory practices that deny girls and women the full and equal accommodations, advantages, facilities, and services of Defendants' business establishments, including but not limited to classifying, categorizing, and segregating its users by gender; and intentionally directing harmful content, including content related to eating disorders, to girls and women because of their gender.

331.    Defendants' discriminatory practices are not supported by any compelling social policy or societal interest.

332.    Defendants are liable to Plaintiff for statutory damages pursuant to section 52(a) of the California Civil Code for each and every offense, as well as attorneys' fees, costs, and expenses incurred in bringing this action.

333.    Plaintiffs are further entitled to all other legal and equitable relief available, including injunctive relief.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for judgment against Meta, Snap and TikTok for monetary damages for the following harm:

1.    Past physical and mental pain and suffering of E.R., in an amount to be more readily ascertained at the time and place set for trial.

2.    Loss of future income and earning capacity of E.R.

3.    Past and future medical expenses of E.R.

4.    Past physical and mental pain and suffering of T.R., in an amount to be more readily ascertained at the time and place set for trial.

5.    Monetary damages suffered by T.R.

6.    Punitive damages.

7.    For the reasonable costs and attorney and expert/consultant fees incurred in this action.

8.     For injunctive relief.

9.     For such other and further relief as this Court deems just and equitable.

DATED this 17th day of August 2022.

SOCIAL MEDIA VICTIMS LAW CENTER PLLC

By: _____

    Laura Marquez-Garrett, SBN 221542

Laura Marquez-Garrett
laura@socialmediavictims.org
1390 Market St, Suite 200
San Francisco, CA 94102
Ph: 206-294-1348

Matthew Bergman
matt@socialmediavictims.org
Glenn Draper
glenn@socialmediavictims.org
SOCIAL MEDIA VICTIMS LAW CENTER
821 Second Avenue, Suite 2100
Seattle, WA 98104
Telephone: (206) 741-4862
Facsimile: (206) 957-9549

Christopher A. Seeger
cseeger@seegerweiss.com
Christopher Ayers
cayers@seegerweiss.com
SEEGER WEISS LLP
55 Challenger Road
Ridgefield Park, NJ 07660
Telephone: 973-639-9100
Facsimile: 973-679-8656

Robert H. Klonoff
klonoff@usa.net
ROBERT KLONOFF, LLC
2425 S.W. 76th Ave.
Portland, Oregon 97225
Telephone: (503) 702-0218
Facsimile: (503) 768-6671

Attorneys for Plaintiffs